**UNITED STATE DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| FRIO ENERGY PARTNERS, LLC | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| vs. | § | Civil Action No.    1:22-cv-9766 |
| | § | |
| FINANCE TECHNOLOGY | § | |
| LEVERAGE, LLC | § | |
| | § | |
| *Defendant.* | § | |

**Plaintiff Frio Energy Partners, LLC'S Complaint**

Plaintiff Frio Energy Partners, LLC ("Frio Energy Partners"), by and through their undersigned counsel, files Frio Energy Partners' Complaint ("Complaint") against defendant Finance Technology Leverage, LLC ("FTL"), and in support, states as follows:

**I. <u>STATEMENT OF THE CASE</u>**

1.      This action arises from Frio Energy Partners' detrimental reliance on both written and verbal assurances made by its professed partner, the global private equity firm, FTL, during a joint effort to identify and acquire investment opportunities in oil and gas producing properties in the Permian Basin located in West Texas and New Mexico.

2.      FTL made these representations to induce Frio Energy Partners to perform months of uncompensated labor for FTL's benefit, pay FTL an advanced structured deposit of $740,000 in cash, and jeopardize Frio Energy Partners' own business reputation with third-party sellers. Specifically, FTL represented to Frio Energy Partners that FTL (1) had or would secure $150 million in initial investment capital for Frio Energy Partners to deploy by January 2022; (2) would execute a formal partnership agreement with Frio Energy Partners soon after signing the term

sheet; (3) would fund the purchase of an oil and gas acquisition opportunity valued at approximately $10.5 million which was sourced, researched, and negotiated by Frio Energy Partners; and (4) would pay Frio Energy Partners for the services and labor incurred on its behalf.

3.　　Today, over 14 months later, it has become clear that FTL's representations were negligently made to Frio Energy Partners, without any regard to the true facts, and as evidenced by the fact that FTL has failed to show any ability to make any of those representations a reality.

## II.  THE PARTIES

4.　　Plaintiff Frio Energy Partners, LLC ("Frio Energy Partners") is a limited liability company organized and existing under the laws of Delaware.  Frio Energy Partners has members all of whom are natural persons who are citizens of and domiciled in Texas.

5.　　Defendant Finance Technology Leverage, LLC ("FTL") is a limited liability company organized and existing under the laws of Delaware.  Upon information and belief, FTL has members that are all natural persons who are citizens of and domiciled in California and the United Kingdom.

## III.  JURISDICTION AND VENUE

6.　　This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and, as the amount in controversy exceeds $75,000.

7.　　Additionally, this Court has personal jurisdiction over FTL, because the claims set forth herein arise from the August 6, 2021, US $150,000,000 Financing Proposal Indicative Term Sheet (the "Term Sheet") executed by the parties.[1]  The Term Sheet expressly provides as a binding

---

[1]　　A true and accurate copy of the Term Sheet is attached hereto as Exhibit A.

term that "each of the parties hereto consents to the exclusive jurisdiction of the State and Federal courts of New York with respect to the Term Sheet."[2]  The Term Sheet further provides that "[t]his Term Sheet (and any non-contractual obligations arising out of or in connection with this term sheet) shall be governed by and construed in accordance with New York law."[3]

8.      Venue is proper in this district under 28 U.S.C. §1391 and pursuant to the Term Sheet that seeks to apply New York law.[4]

## IV.  FACTS

**A.      FTL Solicits Frio Energy Partners' Partnership**

9.      FTL is a global private equity firm, established in 2013, that is primarily engaged in creating structured financings for projects in aerospace, energy, and industrial technology.

10.      In or around early 2021, FTL became interested in expanding into investment opportunities in non-operated working interests in oil- and gas-producing properties in the Permian Basin located in West Texas and New Mexico.

11.      In or around April 2021, FTL first approached Aaron Davis ("Davis"), an oil and gas executive with substantial experience managing, acquiring, and exploiting oil and gas opportunities in and around the Permian Basin.  Specifically, FTL was interested in partnering with Davis to head up an experienced management team to assist FTL in sourcing and acquiring non-operating working interests in oil and gas investment opportunities in the Permian Basin, performing due diligence on those opportunities, negotiating the acquisition of those opportunities, and eventually developing and operating those opportunities.

---

[2]      Exhibit A, Term Sheet at 3 ("Jurisdiction").
[3]      *Id.* at 3 ("Governing Law").
[4]      *Id.* at 3 ("Governing Law" and "Jurisdiction").

3

12.     At the time, Davis was actively managing an exploration and production company for another Texas private equity group, but Davis agreed to stay in contact and let FTL know if and when Davis became available.

13.     On June 22, 2021, Davis informed FTL that he was available to look at new opportunities with FTL, and the two parties began discussing a formal business partnership.

14.     Simultaneously with these discussions, Davis formed Frio Energy Partners to enter into the formal business relationship with FTL, and Davis began recruiting others and forming Frio Energy Partners' experienced management team that was capable and ready to source and operate new oil and gas opportunities in the Permian Basin.

15.     On July 9, 16, 21, and 30, 2021, Davis, on behalf of Frio Energy Partners, participated in telephone conference calls primarily led by Frederick Giarrusso ("Giarrusso"), the CEO of FTL (the "July 2021 Conference Calls").

16.     The two parties discussed the details of FTL partnering with Frio Energy Partners for the acquisition of non-operated working interests in oil- and gas-producing properties in the Permian Basin.

17.     During the July 2021 Conference Calls, Giarrusso, on behalf of FTL, represented to Davis and Frio Energy Partners the following:

    a.    FTL was a reliable and trustworthy partner.

    b.    FTL was raising a $150 million to $300 million fund to invest in non-operated oil and gas development projects in Texas and New Mexico (the "Investment Fund").

    c.    FTL had already raised some capital and had firm commitments to raise the remaining capital to close the Investment Fund with at least $150 million of deployable capital by January 2022.

    d.    FTL would execute a formal partnership agreement with Frio Energy Partners by the end of January 2022 or soon thereafter in exchange for Frio

Energy's agreement to contribute up to $740,000 as an advance deposit to the Investment Fund while Frio Energy Partners identified, conducted due diligence, negotiated the acquisition, and eventually developed and operated the newly identified investment opportunities.

e.     FTL would fully compensate Frio Energy Partners for its general and administrative ("G&A") costs and any other reasonable out-of-pocket expenses incurred in sourcing investment opportunities and performing work for FTL from January 2022 forward.

**B.     FTL and Frio Energy Partners Execute the Term Sheet.**

18.     On August 6, 2021, FTL and Frio Energy Partners (collectively the "Parties") executed the Term Sheet.[5]

19.     Pursuant to the Term Sheet, the Parties agreed to the basic parameters for a future contemplated transaction, as outlined in the document's opening paragraph:

This Indicative Term Sheet indicates the basic parameters for a contemplated Transaction and is neither an offer nor a commitment to engage in the Transaction. Indicative terms herein are for discussion purposes, and do not represent final contractual wordings. Final terms for the Transaction will be as expressed in a set of definitive documents at the close of the Transaction. [6]

20.     The Term Sheet reflected FTL's continued representation that it already had an initial commitment for at least $150 million and up to $300 million for the Investment Fund.

| Fund Size | US $150,000,000 Debt Facility ("Fund" or "Funds") with option to increase to $300,000,000 with a mutual election[7] |
|---|---|

21.     The Investment Fund was to be used by Frio Energy Partners "to acquire interests in non-operated oil and gas development projects within the United States (the 'Projects')."[8]

---

[5]     Exhibit A at 1.
[6]     *Id*.
[7]     *Id.*
[8]     *Id.*

22.     The Term Sheet also required that the Parties "jointly develop a set of parameters to define Projects which may be acquired with the Fund (the 'Project Parameters')" and that only "Projects which meet the Project Parameters will qualify for financing by the Fund."[9]

23.     Additionally, FTL represented that it intended to close a partnership agreement with Frio Energy Partners by January 15, 2022, or soon thereafter.

| | |
|---|---|
| **Closing Date** | The date upon which all final documents are executed, and initial funds are transferred (the "Close").<br><br>The Close is initially targeted herein for 15 January 2021 [sic] (the "Anticipated Close"). The Parties acknowledge that this is a target, and not a guaranteed date.[10] |

24.     Though the Parties agreed that some of the provisions in the Term Sheet were for discussion purposes only, they also agreed the following provisions would be binding:

| | |
|---|---|
| **Binding Provisions** | This term sheet is a non-exhaustive summary of the proposed terms and conditions of the Transaction and, except for the following provisions:<br><br>   (a) Structuring Deposit,<br><br>   (b) Expenses,<br><br>   (c) Governing Law, and<br><br>   (d) Jurisdiction,<br><br>this term sheet is not intended to create any legally binding relationship between the Parties or any legal obligations on the part of either of them.[11] |

---

[9]   *Id.*
[10]  *Id.*
[11]  *Id.* at 3.

25.     The "Structuring Deposit" and "Expenses" provisions also state:

| | |
|---|---|
| **Structuring Deposit** | Upon signing this Term Sheet, Company shall pay the Structuring Agent a Structuring Deposit of $100,000 per month, for a maximum of 6 months, followed by $70,000 for each of months 7 and 8. For clarity, the Structuring Deposit is only paid until the Close, or month 8, whichever comes sooner. |
| **Expenses** | Upon the Close, Company, by using proceeds from the debt, will pay Investor's and Company's reasonable legal, accounting, travel, and other professional service fees, up to $500,000.<br><br>After the Close, budgeted G&A expenses associated with pre-deal expenses will be reimbursed.[12] |

26.     The "Governing Law" and "Jurisdiction" provisions state:

| | |
|---|---|
| **Governing Law** | This term sheet (and any non-contractual obligations arising out of or in connection with this term sheet) shall be governed by and construed in accordance with New York law. |
| **Jurisdiction** | This Term Sheet shall be governed by the laws of the State of New York without regard to conflicts of law principles.<br><br>Each of the parties hereto consents to the exclusive jurisdiction of the State and Federal courts of New York with respect to this Term Sheet.[13] |

## C.     FTL Provides Letters of Commitment

27.     FTL held or appeared to hold unique or special expertise in raising investment capital and held themselves out to Frio Energy Partners as having special knowledge about the amount of capital that was or would be available for the Investment Fund.

---

[12]      *Id.* at 3.
[13]      *Id.*

28.     On or about October 22, 2021, Frio Energy Partners requested that FTL provide proof of capital to show potential third-party sellers that Frio Energy Partners was a legitimate buyer capable of bidding and acquiring multi-million-dollar oil and gas assets that were available for sale.

29.     FTL and Frio Energy Partners had a special relationship of trust and confidence and FTL dissuaded Frio Energy Partners from conducting further inquiry into FTL's ability to secure financing or proof of the actual amount of capital available through the Investment Fund.

30.     In response to Frio Energy Partners' request for proof of capital, FTL, once more through its representatives, Giarrusso and Glen Surles ("Surles"), FTL's director of finance and risk management, verbally assured Davis and Frio Energy Partners that FTL had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022.

31.     In or around October 22, 2021, FTL knew or had reason to know that it had not secured the minimum requisite $150 million of capital to invest through the Investment Fund.

32.     In or around October 22, 2021, FTL disregarded the true facts of the capital available for the Investment Fund and assured Frio Energy Partners that it had secured the funding with full knowledge that Frio Energy Partners would: (a) rely on that information to continue sourcing, vetting, and securing investment opportunities with third-parties, and (b) rely on that information to continue making monthly payments to FTL towards the Structuring Deposit.

33.     In or around October 22, 2021, FTL also sent letters of commitment ("Letters of Commitment"), signed by Giarrusso, on behalf of Frio Energy Partners to third-party sellers, including Occidental Petroleum, Occidental Oil & Gas, Varde Partners, EOG Resources, and One Energy Partners, stating that FTL had partnered with Frio Energy Partners and had an initial

commitment of $150 million in capital available to fund purchases of non-operated working interests in oil and gas producing properties in the Permian Basin.[14]

34.     Based on FTL's representations in the Letters of Commitment, Frio Energy Partners reasonably believed that FTL had partnered with Frio Energy Partners and that FTL was in a financial position to fund potential investment opportunities and already had an initial commitment for $150 million.

**D.     Frio Energy Partners Sources Multiple Deals for FTL.**

35.     Based on FTL's representations to Frio Energy Partners and in the Letters of Commitment, Frio Energy Partners promptly began searching for potential investment opportunities in Texas and New Mexico for the Investment Fund and performing due diligence on the opportunities it found.

36.     Frio Energy Partners performed this work with the full knowledge, approval, and encouragement of FTL.

### i.     The RSC Permian Transaction

37.     On or about November 19, 2021, Frio Energy Partners sourced its first deal for FTL, valued at approximately $107 million ("the RSC Permian Transaction").

38.     The RSC Permian Transaction fit FTL's project parameters, but FTL passed on the deal.

39.     While not aware at the time, Frio Energy Partners now has reason to believe that FTL passed on the RSC Permian Transaction because it had not raised anywhere close to the promised $150 million for the Investment Fund.

---

[14]     A true and correct copy of the October 22, 2021 Letters of Commitment are attached hereto as Exhibit B.

40.     Although FTL knew on or around November 19, 2021 that it had not secured the minimum requisite $150 million of capital to invest through the Investment Fund, FTL failed to inform Frio Energy Partners and encouraged Frio Energy Partners to continue sourcing other opportunities.

### ii.     The Meco IV Transaction

41.     On or about December 22, 2021, Frio Energy Partners sourced its second deal for FTL, valued at approximately $36 million (the "Meco IV Transaction").

42.     The Meco IV Transaction, again, fit FTL's project parameters.

43.     On December 22, 2021, FTL authorized Frio Energy Partners to bid $36 million for the deal.

44.     On December 27, 2021, FTL authorized Frio Energy Partners to bid $38.3 million for the deal, however, a competing purchaser out bid Frio Energy Partners, and the deal was lost.

45.     Based on FTL's authorizations to bid, Frio Energy Partners reasonably believed that FTL had the money necessary to bid and would deliver on the transaction if the bid was accepted.

46.     Frio Energy Partners now has reason to believe that FTL did not in fact have the money, despite authorizing multiple bids, and would not have been able to acquire the Meco IV Transaction in December 2021, even if Frio Energy Partners had been awarded the bid.

47.     FTL failed to inform Frio Energy Partners that it had not secured the capital and encouraged Frio Energy Partners to continue sourcing other opportunities.

### iii.     The Tier 1 Transaction

48.     On or about January 19, 2022, Frio Energy Partners sourced its third deal for FTL, valued at approximately $108 million (the "Tier 1 Transaction").

49.     Like the prior RSC Permian Transaction and Meco IV Transaction, the Tier 1 Transaction fit FTL's project parameters.

50.     However, for reasons that FTL refused to tell Frio Energy Partners, FTL passed on the Tier 1 Transaction.

51.     Upon information and belief, FTL passed on the Tier 1 Transaction because it had not raised any money for the Investment fund in January 2022, and FTL was unable to fund such a large acquisition.

52.     FTL failed to inform Frio Energy Partners that it had not secured the capital and encouraged Frio Energy Partners to continue sourcing other opportunities.

### iv.     The Parker Little Family Transaction

53.     On or about February 25, 2022, Frio Energy Partners sourced its fourth deal for FTL, valued at approximately $55 million (the "Parker Little Family Transaction").

54.     The Parker Little Family Transaction fit the project parameters that FTL sought Frio Energy Partners to source for the Investment Fund.

55.     On February 25, 2022, FTL authorized Frio Energy Partners to first bid $45 million for the Parker Little Family Transaction.

56.     Thereafter, on March 8, 2022, FTL authorized Frio Energy Partners to bid $55 million.

57.     Frio Energy Partners was outbid by a competing purchaser, and the deal was lost.

58.     Based on FTL's authorizations to bid, Frio Energy Partners reasonably believed that FTL had the money necessary to complete the transaction, should Frio Energy Partners win the bid.

11

59.     Upon information and belief, FTL did not in fact have the money to fund the acquisition of the Parker Little Family Transaction, had Frio Energy Partners won the bidding process.

60.     FTL failed to inform Frio Energy Partners that it had not secured the capital and encouraged Frio Energy Partners to continue sourcing other opportunities.

**E.     FTL Admits That It Has Failed to Raise Any Funds.**

61.     By April 2022, Frio Energy Partners and FTL still had not acquired a transaction and finalized their partnership agreement; however, Frio Energy Partners was still performing work and providing services to FTL without pay.

62.     On April 13, 2022, Davis met with Giarrusso, via Zoom Meetings.  During the Zoom meeting, Davis informed Giarrusso that Frio Energy Partners could not continue working for FTL for free and demanded to know the status of the Parties' partnership agreement.

63.     On April 13, 2022, FTL (Giarrusso) admitted to Frio Energy Partners (Davis) that FTL had failed to raise the required capital for the Investment Fund.  This was the first time that FTL informed Frio Energy Partners that the Investment Fund was not already financed with the minimum $150 million as FTL had continuously represented.

64.     To make matters worse, Giarrusso stated that FTL would not pay Frio Energy Partners or finalize the closing of the partnership agreement until FTL had raised the $150 million minimum for the Investment Fund.

65.     Finally, Giarrusso stated that the reason FTL had failed to raise the required capital for the Investment Fund was due to an unforeseen "market change" in December 2021.

66.     Despite this alleged setback, Giarrusso assured and represented to Davis and Frio Energy Partners that FTL had now altered its capital raise strategy and was back on track with fundraising efforts.

67.     Based on these representations, FTL directed Frio Energy Partners to continue sourcing and vetting potential deals for FTL and the Investment Fund.

68.     On April 22, 2022, in another Zoom meeting, Giarrusso informed Davis that FTL was now planning to raise $40 million in equity and $110 million in debt to fill out the initial phase of the Investment Fund.

69.     Further, Giarrusso assured that the Investment Fund would raise half the equity in May 2022 and the other half in June 2022. Specifically, Giarrusso stated that FTL would have around ten committed investors, which would cover most of the equity raise requirements, and that Frio Energy Partners should continue sourcing and vetting opportunities for FTL.

70.     Giarrusso also represented that FTL was committed to paying Frio Energy Partners once the Investment Fund's capital was raised, the fund was closed, and the written partnership agreement was finalized.

**F.     Frio Energy Partners Continues to Work for FTL.**

71.     Based on the assurances from FTL, Frio Energy Partners continued to perform labor and services for FTL in identifying and vetting new opportunities.

72.     On or about May 12, 2022, Frio Energy Partners sourced its fifth deal for FTL, valued at approximately $240-270 million (the "Alpha Permian Transaction").

73.     The Alpha Permian Transaction again fit the criteria of what FTL had requested that Frio Energy Partners source.  However, after it became clear the seller wanted $350 million for the deal, the Parties walked away.

13

**G.      Frio Energy Partners Is Misled by FTL on the Max Permian Transaction.**

74.      On or about May 19, 2022, Frio Energy Partners sourced its sixth deal for FTL, valued at approximately $10.5 million (the "Max Permian Transaction").

75.      The deal again fit the criteria of what FTL requested that Frio Energy Partners source.

76.      Given FTL's prior admission that it had authorized bids on prior projects, despite not having raised the necessary funds, Frio Energy Partners asked FTL multiple times to confirm that FTL had actually raised the necessary funds before moving forward with placing a bid on the Max Permian Transaction.

77.      On or about May 24, 2022, Giarrusso and Surles of FTL represented to Frio Energy Partners that FTL had raised the requisite capital to acquire and close the Max Permian Transaction.

78.      FTL authorized Frio Energy Partners to first bid $9.2 million on May 25, 2022, and then later $10.5 million on June 2, 2022.

79.      On June 15, 2022, Frio Energy Partners won the bidding process and signed a purchase sales agreement ("PSA") with the seller for the Max Permian Transaction.

80.      FTL funded the required deposit for the Max Permian Transaction on June 27, 2022.

81.      After the PSA was signed, Frio Energy Partners conducted due diligence, which was finished by the closing time frame on July 15, 2022.

82.      On July 12, 2022, FTL informed Frio Energy Partners for the first time that, despite its prior assurances and representations, FTL did not have the necessary funds to close the Max Permian Transaction for $10.5 million on July 15, 2022.

14

83.     Frio Energy Partners was able to negotiate an extension of the closing, but FTL could not commit to obtaining the balance of the $10.5 million in funds in any new closing time frame.

84.     As a result of FTL's failure to fund the Max Permian Transaction and commit to a new closing date, the Max Permian Transaction did not close.

85.     Up and until this point, Frio Energy Partners relied on FTL's representation that it had raised the required capital for the Investment Fund in excess of the $10.5 million necessary to close the Max Permian Transaction.

86.     Frio Energy Partners did not become aware of FTL's failure to, yet again, raise the required capital until July 12, 2022.

**H.     FTL Agrees That It Owes Frio Energy Partners for Their Labor and Services.**

87.     On or about July 15, 2022, Davis informed FTL that Frio Energy Partners could not continue performing work for FTL without compensation and demanded that FTL pay Frio Energy Partners for its labor from January to July 2022 and for the costs incurred in connection with the failed Max Permian Transaction.

88.     On or about July 15, 2022, FTL agreed to cover the out-of-pocket costs incurred by Frio Energy Partners immediately and promised that it would reimburse Frio Energy Partners' labor costs in the near future.

89.     At that time, Frio Energy Partners' labor costs from January to July 2022 were approximately $466,667.

90.     Frio Energy Partners' out-of-pocket costs incurred in connection with the Max Permian Transaction were $84,110.

91.     To date, FTL has failed to fully compensate Frio Energy Partners for these costs. In that regard, FTL has paid Frio Energy Partners only $53,459, which does not even cover the out-of-pocket costs FTL agreed to pay in July 2022 to reimburse Frio Energy Partners "immediately."

**I.      Frio Energy Partners Sources One Last Deal for FTL.**

92.     Prior to FTL's failure to close the Max Permian Transaction, on or about June 23, 2022, Frio Energy Partners sourced its seventh deal for FTL, valued at approximately $120 million (the "ARM Transaction").

93.     Like the six deals before it, the ARM Transaction fit the criteria of what FTL requested that Frio Energy Partners source.

94.     On or about June 23, 2022, FTL authorized Frio Energy Partners to submit a joint offer with another private equity group.

95.     However, the combined offer, with Frio Energy Partners putting up 50%, did not satisfy the seller's asking price, and the ARM Transaction fell through.

96.     Given FTL's subsequent July 12, 2022 admission that it had not raised the $10.5 million required to acquire the Max Permian Transaction, FTL did not in fact have the money it authorized Frio Energy Partners to bid on the ARM Transaction.

97.     Upon information and belief, FTL would not have been able to fund the ARM Transaction, even if Frio Energy Partners had won the bid.

**J.**     **FTL Fails to Raise Capital for the Investment Fund and Reneges on Its Agreement to Compensate Frio Energy Partners for Months of Work.**

98.     On August 2, 3, 9, 17, 23, 24, 27, and 30, 2022, Frio Energy Partners and FTL participated in Zoom meetings (the "August 2022 Zoom Meetings").  During the August 2022 Zoom Meetings, the Parties discussed the following:

a.     Frio Energy Partners' demand for payment for its work performed for and on behalf of FTL from January to August 2022.

b.     A status update on FTL's fundraising efforts for the Investment Fund.

c.     An update on finalizing the written partnership agreement between the Parties.

d.     The Parties entering into a master service agreement ("MSA").

e.     What to do with the $740,000 advance structured deposit that Frio Energy Partners had already contributed to the Investment Fund, as set forth in the Term Sheet.

99.     During the August 2022 Zoom Meetings, FTL *again* made excuses for its failure to raise the promised capital.

100.     FTL again promised that new investors had been identified and that FTL was on the verge of raising the needed capital to move forward.

101.     FTL urged Frio Energy Partners to give it another chance to raise the capital before terminating the Parties' business relationship.

102.     Frio Energy Partners agreed to give FTL a final deadline of September 1, 2022, to compensate Frio Energy Partners for its past labor and costs, finalize a partnership agreement or MSA with Frio Energy Partners, and resolve any and all outstanding issues between the Parties.

103.     On September 1, 2022, FTL failed to deliver on any of its promises.

104.     In that regard, FTL could not show Frio Energy Partners proof that it had raised any capital for the Investment Fund, other than Frio Energy Partners' $740,000 contribution.

105.     FTL did not compensate Frio Energy Partners for its past labor performed on FTL's behalf or the out-of-pocket expenses incurred by Frio Energy Partners during the course of the Max Permian Transaction, as FTL had previously agreed to do.

106.     Finally, FTL failed to finalize either a written partnership agreement or MSA with Frio Energy Partners by September 1, 2022.

107.     Accordingly, on September 2, 2022, Frio Energy Partners issued a letter to FTL demanding that FTL return Frio Energy Partners' structured deposit and compensate Frio Energy Partners for its labor and expenses that FTL accepted and retained the benefit from.

108.     On September 20, 2022, FTL responded that it rejected Frio Energy Partners' demand.  To date, FTL has failed to return Frio Energy Partners' deposit or compensate Frio Energy Partners for its labor and expenses.

109.     Upon information and belief, and contrary to its many representations, FTL has still not raised the $150 million for the Investment Fund.

## V.  CAUSES OF ACTION

### COUNT ONE
### Quantum Meruit

110.     Frio Energy Partners herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

111.     At the direction and on behalf of FTL, Frio Energy Partners expended its own labor and expenses to source potential investment opportunities for FTL.  Specifically, Frio Energy Partners sourced, researched, and negotiated closing in connection with multiple oil and gas opportunities.  All of the investment opportunities that Frio Energy Partners sourced for FTL complied with the Project Parameters, as required by the Term Sheet.  Frio Energy Partners also paid the $740,000 Structuring Deposit to FTL in connection with the Parties' anticipated joint

investment, which, due to no fault of Frio Energy Partners, never materialized. Frio Energy Partners provided the funding and performed these services in good faith.

112. FTL accepted the services and Structuring Deposit provided by Frio Energy Partners, and even encouraged Frio Energy Partners to continue sourcing potential investment opportunities.

113. Frio Energy Partners had an expectation that it would be compensated for its provision of services. FTL knew Frio Energy Partners expected compensation for the services and labor provided at a rate of approximately $2.275 million per year.

114. In fact, when Frio Energy Partners demanded that FTL compensate it for the reasonable value of its labor and out-of-pocket expenses incurred between January and June 2022, FTL agreed to pay the $466,667 in labor costs and $84,110 in out-of-pocket expenses. Based on its promise to compensate Frio Energy Partners for its services performed, FTL insisted that Frio Energy Partners continue providing such services until a partnership agreement was executed.

115. FTL has had multiple opportunities to compensate Frio Energy Partners for the reasonable value of its labor and costs associated with providing those services, but has failed and refused to do so.

## COUNT TWO
### Unjust Enrichment

116. Frio Energy Partners herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

117. FTL has been enriched at Frio Energy Partners' expense. In that regard, Frio Energy Partners provided a benefit to FTL in the form of s $740,000 Structuring Deposit, which was made for the specific purpose of being used in a joint investment between FTL and Frio Energy Partners that, to date, has not occurred.

118.    Frio Energy Partners made monthly cash payments to FTL of the following amounts on the following dates:

| | |
|---|---|
| 8.10.21: | $100k |
| 9.10.21: | $100k |
| 10.12.21: | $100k |
| 11.15.21: | $100k |
| 12.17.21: | $100k |
| 1.14.22: | $100k |
| 2.25.22: | $70k |
| 3.14.22: | $70k |
| **Total:** | **$740k**[15] |

119.    FTL was enriched by Frio Energy Partners' payments of the Structuring Deposit, however, FTL has failed to execute any joint investment with Frio Energy Partners or return the Structuring Deposit on demand of Frio Energy Partners.

120.    Frio Energy Partners paid the Structuring Deposit based on FTL's repeated representations that, among other things, the Parties would execute a joint investment and partnership agreement and FTL had raised or would raise a minimum of $150 million to be used in connection with investment opportunities sourced by Frio Energy Partners.  FTL knew that the Structuring Deposit was to be used in connection with joint investment opportunities.  As set forth herein, FTL failed to raise the capital necessary to fund any investment opportunities.

121.    FTL has been unjustly enriched.

122.    To permit FTL to retain the $740,000 Structuring Deposit would be against equity and good conscience.

123.    Accordingly, Frio Energy Partners seeks a full refund of the Structuring Deposit.

---

[15]    Exhibit C, Proofs of payment to FTL from 8.10.21 to 3.14.22.

### COUNT THREE
**Promissory Estoppel**

124.     Frio Energy Partners herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

125.     FTL made a clear and unambiguous promise to Frio Energy Partners that FTL: (1) had either secured or was able to secure $150 million in investment capital; (2) would execute a formal partnership agreement with Frio Energy Partners soon after signing the Term Sheet; (3) would fund the purchase of an oil and gas acquisition opportunity valued at approximately $10.5 million which was sourced, researched, and negotiated by Frio Energy Partners; and (4) would pay Frio Energy Partners for it services and labor incurred on its behalf.

126.     Frio Energy Partners relied on FTL's promise to raise the $150 million in capital and compensate Frio Energy Partners for its labor and reimburse Partners for its out-of-pocket expenses.

127.     Frio Energy Partners' reliance was reasonable, as the Parties had executed a Term Sheet contemplating execution of joint investments and a partnership agreement.

128.     FTL provided Letters of Commitment representing its partnership with Frio Energy Partners and commitment to raise at least $150 million in capital to potential investors.

129.     FTL also represented multiple times to Frio Energy Partners that it had identified investors and would be able to raise the required capital.

130.     FTL authorized multiple bids for investment opportunities sourced by Frio Energy Partners, for which the capital from the Investment Fund was to be used to finance.

131.     FTL agreed that Frio Energy Partners should be compensated for its labor and out-of-pocket expenses and that FTL would compensate FTL accordingly.

132.    Further, FTL continued to urge Frio Energy Partners to source more investment opportunities and incur more out-of-pocket expenses under the guise that FTL would fulfill its promises.

133.    Frio Energy Partners has suffered significant damages as a result of its reliance. First, Frio Energy Partners has provided over a year's worth of labor and services to FTL for which it has not been compensated, valued at approximately $3 million.  Second, Frio Energy Partners has paid the $740,000 Structuring Fee in cash to FTL, for which no investment or partnership has occurred.  Thus, Frio Energy Partners has suffered losses of at least $3,740,000.

## COUNT FOUR
### Negligent Misrepresentation

134.    Frio Energy Partners herein restates and realleges the allegations contained in the preceding paragraphs as set forth above.

135.    FTL made the following misrepresentations to Frio Energy Partners: (1) FTL had secured the $150 million in investment capital; (2) FTL would execute a formal partnership agreement with Frio Energy Partners soon after signing the Term Sheet; (3) FTL would fund the purchase of an oil and gas acquisition opportunity valued at approximately $10.5 million, which was sourced, researched, and negotiated by Frio Energy Partners; and (4) FTL would pay Frio Energy Partners for it services and labor incurred on its behalf  (the "Misrepresentations").

136.    FTL created a fiduciary-kind of relationship with Frio Energy Partners that bound the parties together when FTL requested that Frio Energy Partners pay FTL $740,000 in cash to be used in furtherance of a joint investment and Frio Energy Partners complied.

137.    FTL also held or appeared to hold unique or special expertise in raising investment capital and held themselves out to Frio Energy Partners as having special knowledge about the amount of capital that was or would be available for the Investment Fund.

22

138.   FTL and Frio Energy Partners also had a special relationship of trust and confidence, and FTL dissuaded Frio Energy Partners from conducting further inquiry into FTL's ability to secure financing or proof of the actual amount of capital available through the Investment Fund.

139.   FTL further created a fiduciary-kind of relationship with Frio Energy Partners when it gave the Letters of Commitment to Frio Energy Partners and stated in writing that it had: (1) partnered with Frio Energy Partners; and (2) instructed Frio Energy Partners to share those letters with third parties for the purpose of those parties being made aware that Frio Energy Partners worked with and for FTL.

140.   Giarrusso, the CEO of FTL, and the primary speaker of the Misrepresentations to Frio Energy Partners, was fully aware or should have been fully aware that his statements were exaggerations or half-truths at best of what his company, FTL, had done or would do.  He was not an underling or analyst passing on information he was not sure of.

141.   The Misrepresentations were made by FTL for the direct purpose of inducing Frio Energy Partners to work for FTL and to achieve FTL's goal of obtaining a foothold in the energy investment space.

142.   FTL was aware that Frio Energy Partners would rely on the Misrepresentations to source investment opportunities, which would advance FTL's goal of breaking into the energy investment industry.

143.   FTL also was aware that Frio Energy Partners would rely on the Misrepresentations in tendering the $740,000 Structuring Deposit.  Indeed, Frio Energy Partners did in fact rely on FTL's Misrepresentations and worked for FTL from November 2021 to August 2022.

144.    FTL's Misrepresentations were confirmed as exaggerated and misstated several times.  For example, FTL repeatedly admitted that it had failed to raise the $150 million minimum in capital, despite authorizing Frio Energy Partners to make multiple bids on various investment opportunities.  In fact, FTL has never secured anywhere close to the $150 million in capital funding that it claimed it could raise.

145.    FTL's Misrepresentations resulted from its own negligence and lack of due diligence.

146.    Frio Energy Partners actually and justifiably relied on FTL's statements: As stated above, Frio Energy Partners' intended to partner with FTL to acquire and operate oil and gas assets and to get paid for its work towards that goal.

147.    Therefore, when the CEO of FTL made assurances that the money would be raised, a partnership would be formed, a $10.5 million deal could be closed, and Frio Energy Partners would be compensated for its work, Frio Energy Partners justifiably relied on those statements, believing that its CEO would not speak falsely or recklessly about such matters.

148.    Furthermore, FTL is a large and well-known private equity institution with a prior history of above board conduct that Frio Energy Partners looked to with trust and confidence.  Finally, Frio Energy Partners reasonably believed that FTL would not accept its contributions to the Investment Fund or issue it letters of commitment stating that the Parties were partners unless FTL representations were in fact correct.

149.    Frio Energy Partners suffered injury when it relied upon and believed FTL's negligently made statements. Frio Energy Partners spent countless hours and incurred significant expenses attempting to source, research, and close various oil and gas investment opportunities for FTL's benefit and paid $740,000 into an investment fund that never existed.

## VI.  CONDITIONS PRECEDENT

150.    Pursuant to Rule 9(c), all conditions precedent have been performed by Plaintiff or have occurred.

## VII.  DEMAND FOR JURY TRIAL

151.    Plaintiff hereby demands a trial by jury and submits the appropriate fee for same.

## VIII.  RELIEF SOUGHT

152.    WHEREFORE, Plaintiff Frio Energy Partners, LLC requests that this Court enter Judgment in Plaintiff's favor and against Defendant Finance Technology Leverage, LLC as follows:

a.    Defendants be cited to appear and answer herein;

b.    Plaintiff recover from Defendants the following:

(i)    $740,000 in damages incurred and sustained as a result of Defendant's fraud and negligent misrepresentations.

(ii)    Costs for labor and expenses related to Defendant's fraud and negligent misrepresentations;

(iii)    Prejudgment interest and post-judgment interest as allowed by law;

(iv)    Costs of suit;

(v)    Reasonable and necessary attorneys' fees; and

(vi)    Punitive/Exemplary damages.

c.    Plaintiff further prays that this Court award it any and all further relief, both general and special, at law or in equity, to which Plaintiff may be justly entitled.

Dated:      November 16, 2022

Respectfully submitted,

ALLEN & NUNNALLY, LLP
K. Knox "Lighthorse" Nunnally*
Matthew Allen
3701 Kirby Drive, Suite 1212
Houston, Texas 77098
(713) 955-2217 (phone)
(281) 768-5404 (fax)
Knox.Nunnally@Allen-Nunnally.com
Matt.Allen@Allen-Nunnally.com

*Motion for Pro Hac Vice admissions to be submitted*

-and-

By:   /s/ Levi M. Downing_____
KELLEY DRYE & WARREN LLP
Levi M. Downing
Anne-Marie Mitchell
3 World Trade Center
175 Greenwich Street
New York, New York 10007
(212) 808-7800 (phone)
(212) 808-7897 (fax)
ldowning@kelleydrye.com
amitchell@kelleydrye.com

**ATTORNEYS FOR PLAINTIFF**

4877-5228-0127