UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 06/27/2023
```

------------------------------------------------------------------X
                                        :

FRIO ENERGY PARTNERS, LLC,           :

                                  :

                     Plaintiff,     :

                                  :            22-cv-9766 (LJL)

      -v-                       :

                                  :       OPINION AND ORDER

FINANCE TECHNOLOGY LEVERAGE, LLC,   :

                                  :

                    Defendant.    :

                                  :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

       Defendant Finance Technology Leverage LLC ("Defendant" or "FTL") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint ("Complaint") filed against it by Plaintiff Frio Energy Partners, LLC ("Plaintiff" or "Frio Energy").  Dkt. No. 17.  Defendant also moves to strike portions of the Complaint pursuant to Federal Rule of Civil Procedure 12(f). *Id.*

## BACKGROUND

       The Court accepts as true for purposes of this motion the well-pleaded allegations of the Complaint, as supplemented by the documents incorporated by reference.

### I.    The Relevant Parties

       Defendant FTL is a global private equity firm, established in 2013; it is primarily engaged in creating structured financings for projects in aerospace, energy, and industrial technology.  Dkt. No. 1 ¶ 9.  In or around early 2021, it developed an interest in investment opportunities in non-operated oil- and gas-producing properties in the Permian Basin located in West Texas and New Mexico.  *Id.* ¶ 10.  Plaintiff Frio Energy is a limited liability company formed in June 2021 by non-party Aaron Davis ("Davis") to source and operate new oil and gas

opportunities in the Permian Basin. *Id.* ¶¶ 4, 13, 14. Davis is an oil and gas executive with significant experience managing, acquiring, and exploiting oil and gas opportunities in and around the Permian Basin. *Id.* ¶ 11.

## II.    The Discussions Between Plaintiff and Defendant

In or around April 2021, FTL approached Davis to head up an experienced management team to assist FTL in sourcing and acquiring non-operating working interests in oil and gas investment opportunities in the Permian Basin, performing due diligence on those opportunities, negotiating the acquisition of those opportunities, and eventually developing and operating those opportunities. *Id.* At the time, Davis was actively managing an exploration and production company for another Texas private equity group, but he agreed to stay in touch and let FTL know if and when he became available. *Id.* ¶ 12. On June 22, 2021, Davis informed FTL that he was available to look at new opportunities with FTL, and the two parties began discussing forming a formal business partnership. *Id.* ¶ 13. Davis formed Frio Energy and began recruiting others to join in its management team. *Id.* ¶ 14.

During July 2021, Davis, on behalf of Plaintiff, and Frederick Giarrusso ("Giarrusso"), the Chief Executive Officer of Defendant, participated in a series of telephone conference calls (the "July 2021 Conference Calls") to discuss the details of their proposed partnership for the acquisition of non-operated working interests in oil- and gas-producing properties in the Permian Basin. *Id.* ¶¶ 15–16. During the July 2021 Conference Calls, Giarrusso, on behalf of Defendant, represented to Davis and Plaintiff the following: (1) FTL was a reliable and trustworthy partner; (2) FTL was raising a $150 million to $300 million fund to invest in non-operated oil and gas development projects in Texas and New Mexico (the "Investment Fund"); (3) FTL had already raised some capital and had firm commitments to raise the remaining capital to close the Investment Fund with at least $150 million of deployable capital by January 2022; (4) FTL

would execute a formal partnership agreement with Plaintiff by the end of January 2022 or soon thereafter in exchange for Plaintiff's agreement to contribute up to $740,000 as an advance deposit to the Investment Fund while Plaintiff identified, conducted due diligence, negotiated the acquisition, and eventually developed and operated the newly-identified investment opportunities; and (5) FTL would fully compensate Plaintiff for its general and administrative ("G&A") costs and any other reasonable out-of-pocket expense incurred in sourcing investment opportunities and performing work for FTL from January 2022 forward. *Id.* ¶ 17.

**III.    The Term Sheet**

On August 6, 2021, Plaintiff and Defendant executed a $150,000,000 Financial Proposal Indicative Term Sheet (the "Term Sheet"). *Id.* ¶¶ 7, 18. The Term Sheet states at the outset:

> This indicative Term Sheet indicates the basic parameters for a contemplated Transaction and is neither an offer nor a commitment to engage in the Transaction. Indicative terms herein are for discussion purposes, and do not represent final contractual wordings. Final terms for the Transaction will be as expressed in a set of definitive documents at the close of the Transaction.

*Id.* ¶ 19. The Term Sheet contemplated a transaction in which Plaintiff (defined as the "Company") and FTL Capital Ltd. or a related entity (defined as "Investor") would develop a set of parameters to define projects which may be acquired by the Investment Fund. Dkt. No. 1-1 at 1. The Investment Fund would have a $150 million debt facility with the option to increase to $300 million with a mutual election. *Id.* The Company would use those funds to acquire interests in non-operated oil and gas development projects within the United States. *Id.* The Term Sheet also provided that the Company and the Investor would establish an investment committee (the "Investment Committee") with members from both the Company and the Investor to ensure that the project parameters were met, and the Term Sheet provided that each project required unanimous approval of the Investment Committee prior to an acquisition. *Id.*

The Term Sheet also provided that upon the signing of the Term Sheet, Plaintiff would "pay the Structuring Agent [Defendant] a Structuring Deposit of $100,000 per month, for a maximum of 6 months, followed by $70,000 for each of months 7 and 8." *Id.* at 2.  The Term Sheet continued that "[f]or clarity, the Structuring Deposit is only paid until the Close, or month 8, whichever comes sooner." *Id.*  Upon the close, Plaintiff was required to pay Defendant, "by using proceeds from the debt, a fee equal to 1% of the Fund Size, less any Structuring Deposit paid to date." *Id.* at 3.  The Term Sheet stated that the close would be "initially targeted . . . for 15 January 202[2],"[1] but acknowledged that "this is a target, and not a guaranteed date." *Id.* at 1.

The Term Sheet further stated that "[f]unds will be available for investment for a period of 18 months following the Close" with "[a]ll Debt to be repaid in full within 5 years of the Close." *Id.* at 2.  Each side had the right not to proceed with the transaction "at any stage," by "notify[ing] the other party in writing as soon as reasonably practicable." *Id.* at 3.  If Defendant chose not to proceed, "[80]% of the company-paid Structuring Deposit" would be refunded. *Id.*  If Plaintiff chose not to proceed, "then [75]% of the Structing [sic] Fee, prorated for 6 months, shall be considered fully earned and the unpaid balance payable immediately." *Id.*  The Term Sheet provided with respect to expenses the following:

> Upon the Close, Company, by using proceeds from the debt, will pay Investor's and Company's reasonable legal, accounting, travel, and other professional service fees, up to $500,000.  After the Close, budgeted G&A expenses associated with pre-deal expenses will be reimbursed.

*Id.*

The Term Sheet provided that except for the provisions regarding the Structuring Deposit, expenses, governing law, and jurisdiction, "this term sheet is not intended to create any

---

[1] The Term Sheet says 2021.  Plaintiff alleges that this is a typographic error and it should have stated 2022. Dkt. No. 1 ¶ 23.

legally binding relationship between the Parties or any legal obligations on the part of either of them."[2]  *Id.*

## IV.    Plaintiff Makes Cash Payments and Identifies Investment Opportunities

Beginning on August 10, 2021, and continuing until January 14, 2022, Plaintiff made monthly cash payments to Defendant of $100,000.  Dkt. No. 1 ¶ 118.  On each of February 25, 2022 and March 14, 2022, Plaintiff made payments to Defendant of $70,000.  *Id.*

On or about October 22, 2021, Plaintiff requested that Defendant provide proof of capital to show potential third-party sellers that Plaintiff was a legitimate buyer capable of bidding and acquiring multi-million dollar oil and gas assets that were available for sale.  *Id.* ¶ 28.  In response, representatives of Defendant verbally assured Plaintiff that it had secured or would secure the minimum requisite $150 million of capital by January 2022.  *Id.* ¶ 30.  In addition, in or around October 22, 2021, Defendant sent letters of commitment ("Letters of Commitment"), signed by Giarrusso, to third-party sellers, including Occidental Petroleum, Occidental Oil & Gas, Varde Partners, EOG Resources, and One Energy Partners.  *Id.* ¶ 33.  The Letters of Commitment were stated to "clarify" the relationship between Defendant and Plaintiff and could be shown to "prospective counterparties."  Dkt. No. 1-2.  The Letters of Commitment touted FTL's credentials, including that its principals had worked with several of the major energy companies and "collectively invested over $10 Billion."  *Id.*  They also stated:  "FTL has partnered with Frio for the acquisition of non-operated working interests in oil and gas producing properties located in the Permian Basin.  Our initial commitment is for $150 million in the first phase, though we anticipate taking that to a second phase of over $300 million in the next 12 months."  *Id.*

---

[2] The Term Sheet is governed by New York Law and each party consents to the exclusive jurisdiction of the State and federal courts of New York.  Dkt. No. 1-1 at 3.

According to the Complaint, Defendant knew or had reason to know that it had not secured the minimum requisite $150 million of capital to invest through the Investment Fund by on or about October 22, 2021. *Id.* ¶ 31. Plaintiff claims that Defendant made representations that it had secured the funding with full knowledge that Plaintiff would rely on that information to continue sourcing, vetting, and securing investment opportunities with third parties and to continue making monthly payments to FTL toward the Structuring Deposit. *Id.* ¶ 32. In addition, Defendant dissuaded Plaintiff from conducting further inquiry into Defendant's ability to secure financing or proof of the actual amount of capital available through the Investment Fund. *Id.* ¶ 29. Plaintiff alleges that based on the representations in the Letters of Commitment, Plaintiff reasonably believed that Defendant had partnered with Plaintiff and was in a financial position to fund potential investment opportunities and already had an initial commitment for $150 million. *Id.* ¶ 34.

Plaintiff began searching for potential investment opportunities in Texas and New Mexico and performing due diligence based on Defendant's representations to Plaintiff and in the Letters of Commitment. *Id.* ¶ 35. Plaintiff performed the work with the full knowledge, approval, and encouragement of Defendant. *Id.* ¶ 36.

Between on or about November 19, 2021, and on or about February 25, 2022, Plaintiff sourced four potential deals for FTL, with values ranging from $36 million to $108 million. *Id.* ¶¶ 37–60. Each of the deals fit FTL's project parameters. *Id.* ¶¶ 38, 42, 49, 54. Defendant authorized Plaintiff to bid on two of the transactions (for the Meco IV transaction and for the Parker Little Family transaction), *id.* ¶¶ 43–44, 55–56, but Plaintiff was outbid by a competing purchaser and lost each deal, *id.* ¶¶ 44, 57. Defendant did not authorize Plaintiff to bid on the other two potential transactions but passed on them, including with respect to one of the

transactions (the "Tier 1 Transaction") for reasons that Defendant refused to disclose. *Id.* ¶¶ 38, 50. Plaintiff alleges that it has "reason to believe" that Defendant passed on the two investment opportunities because it had not raised "anywhere close to the promised $150 million for the Investment Fund," *id.* ¶ 39, or "had not raised any money for the Investment fund [sic] in January 2022, and . . . was unable to fund such a large acquisition," *id.* ¶ 51. It also alleges as to the two transactions for which Plaintiff placed bids, that FTL did not have the money to engage in the transactions. *Id.* ¶¶ 46, 59. Plaintiff further alleges that during the time it was engaged in sourcing these transactions, Defendant failed to inform Plaintiff that it had not raised the $150 million for the Investment Fund and encouraged Plaintiff to continue sourcing other opportunities. *Id.* ¶¶ 40, 47, 52, 60.

By April 2022, Plaintiff and Defendant still had not acquired a transaction and finalized their partnership agreement, but Plaintiff was still performing work and providing services to Defendant without pay. *Id.* ¶ 61. On April 13, 2022, Davis met with Giarrusso remotely and informed Giarrusso that Plaintiff could not continue to work for free, and demanded to know the status of the parties' partnership agreement. *Id.* ¶ 62. Defendant admitted that it had failed to raise the required capital for the Investment Fund and stated that Defendant would not pay Plaintiff or finalize the closing of the partnership agreement until Defendant had raised the $150 million minimum for the Investment Fund. *Id.* ¶¶ 63–64. Defendant stated that the reason it had failed to raise the required capital for the Investment Fund was due to an unforeseen "market change" in December 2021. *Id.* ¶ 65. Giarrusso nonetheless assured and represented to Davis and Plaintiff that Defendant had now altered its capital raise strategy and was back on track with fundraising efforts. *Id.* ¶ 66. Based on these representations, Defendant directed Plaintiff to continue sourcing and vetting potential deals for Defendant and the Investment Fund. *Id.* ¶ 67.

On April 22, 2022, in another remote meeting, Giarrusso informed Davis that Defendant was now planning to raise $40 million in equity and $110 million in debt to fill out the initial phase of the Investment Fund.  *Id.* ¶ 68.  Further Giarrusso assured Davis that the Investment Fund would raise half the equity in May 2022 and the other half in June 2022, stating that Defendant would have around ten committed investors which would cover most of the equity raise requirements and that Plaintiff should continue sourcing and vetting opportunities for Defendant.  *Id.* ¶ 69.  Giarrusso represented that Defendant was committed to paying Plaintiff once the Investment Fund's capital was raised, the fund was closed, and the written partnership agreement finalized.  *Id.* ¶ 70.

Plaintiff continued to perform labor and services for Defendant in identifying and vetting new opportunities and in May 2022, sourced two additional potential deals.  *Id.* ¶¶ 71–86.  On or about May 12, 2022, Plaintiff sourced a fifth deal for Defendant, valued at approximately $240-$270 million.  *Id.* ¶ 72.  The transaction fit the criteria of what Defendant had requested that Plaintiff source but after it became clear that the seller wanted $350 million for the deal, the parties walked away.  *Id.* ¶ 73.

On or about May 19, 2022, Plaintiff sourced a sixth deal for Defendant which again fit the criteria of what Defendant had requested that Plaintiff source and that was valued at approximately $10.5 million (the "Max Permian Transaction").  *Id.* ¶¶ 74–75.  Given Defendant's prior admission that it had authorized bids on earlier projects without having the necessary funds, Plaintiff asked Defendant multiple times to confirm that Defendant had actually raised the necessary funds before moving forward with placing a bid on the Max Permian transaction.  *Id.* ¶ 76.  On or about May 24, 2022, Giarrusso and another representative of Defendant represented to Plaintiff that Defendant had raised the requisite capital to acquire and

close the transaction.  *Id.* ¶ 77.  Defendant authorized Plaintiff to first bid $9.2 million on

May 25, 2022, and then later $10.5 million on June 2, 2022.  *Id.* ¶ 78.  On June 15, 2022,

Plaintiff won the bidding process and signed a purchase sales agreement ("PSA") with the seller

for the Max Permian Transaction.  *Id.* ¶ 79.  Defendant funded the required deposit on the Max

Permian Transaction on June 27, 2022, and after the PSA was signed, Plaintiff conducted due

diligence which was finished by the closing time frame on July 15, 2022.  *Id.* ¶ 81.  On July 12,

2022, Defendant informed Plaintiff for the first time that, despite its prior assurances and

representations, it did not have the necessary funds to close the Max Permian Transaction for

$10.5 million on July 15, 2022.  *Id.* ¶ 82.  Plaintiff was able to negotiate an extension of the

closing but Defendant could not commit to obtaining the balance of the $10.5 million in funds in

any new closing time frame.  *Id.* ¶ 83.  As a result, the Max Permian Transaction did not close.

*Id.* ¶ 84.  Up until this point, Plaintiff claims that it relied on Defendant's representation that it

had raised the required capital for the Investment Fund in excess of the $10.5 million necessary

to close the Max Permian Transaction.  *Id.* ¶ 85.  Plaintiff did not become aware of Defendant's

failure to raise the required capital until July 12, 2022.  *Id.* ¶ 86.[3]

## V.    The Relationship Between the Parties Falls Apart

The relationship between the parties apparently fell apart after the failure to close the

Max Permian Transaction.  On or about July 15, 2022, Plaintiff informed Defendant that it could

not continue to work with Defendant without compensation and demanded that Defendant pay

---

[3] Prior to Defendant's failure to close the Max Permian Transaction, on or about June 23, 2022, Plaintiff sourced a seventh deal for Defendant, which fit the criteria of what Defendant had requested that Plaintiff source and that was valued at approximately $120 million.  *Id.* ¶¶ 92–93. Defendant authorized Plaintiff to submit a joint offer with another private equity group; however, the combined offer, with Plaintiff putting up 50%, did not satisfy the seller's asking price, and the transaction fell through.  *Id.* ¶¶ 94–95.  Plaintiff alleges that Defendant did not have the money to authorize Plaintiff to bid on the transaction and would not have been able to fund it had Plaintiff won the bid.  *Id.* ¶¶ 96–97.

Plaintiff for its labor from January to July 2022 and for costs incurred in connection with the failed Max Permian Transaction. *Id.* ¶ 87. Defendant agreed to pay Plaintiff's out of pocket costs, which totaled $84,110, immediately, and promised that it would reimburse Plaintiff's labor costs, which totaled approximately $466,667, in the near future. *Id.* ¶¶ 88–90. However, Defendant has paid only $53,459, which does not even cover Plaintiff's out-of-pocket costs. *Id.* ¶ 91.

In August 2022, the parties participated in a total of eight remote meetings to discuss their relationship. *Id.* ¶ 98. During those meetings, the parties discussed: (1) Plaintiff's demand for payment for work performed for and on behalf of Defendant from January to August 2022; (2) the status of Defendant's fundraising efforts for the Investment Fund; (3) the update on finalizing the written partnership agreement between the Parties; (4) the parties entering into a master service agreement ("MSA"); and (5) what to do with the $740,000 Structuring Deposit that Plaintiff had paid to the Investment Fund pursuant to the Term Sheet. *Id.* Defendant made excuses for its failure to raise the promised capital. *Id.* ¶ 99. Defendant promised that new investors had been identified and that it was on the verge of raising the needed capital to go forward and urged Plaintiff to give it another chance to raise the capital before terminating the parties' business relationship. *Id.* ¶¶ 100–01. Plaintiff gave Defendant a final deadline of September 1, 2022, to compensate Plaintiff for its past labor and costs, finalize a partnership agreement or MSA with Plaintiff, and resolve any and all outstanding issues between the parties. *Id.* ¶ 102. However, by September 1, 2022, Defendant could not show Plaintiff that it had raised any capital for the Investment Fund, other than Plaintiff's $740,000 contribution in the form of the Structuring Deposit, and Defendant failed to deliver on any of its promises. *Id.* ¶¶ 102–04. Defendant did not compensate Plaintiff for its past labor performed on Defendant's behalf or the

out-of-pocket expenses incurred by Plaintiff during the course of the Max Permian Transaction,

and it did not finalize a written partnership agreement with Plaintiff or an MSA with Plaintiff by

September 1, 2022.  *Id.* ¶¶ 105–06.

On September 2, 2022, Plaintiff issued a letter to Defendant demanding the return of its

Structuring Deposit and compensation for its labor and expenses that Defendant had accepted

and from which Defendant had retained benefits.  *Id.* ¶ 107.  On September 20, 2022, Defendant

responded that it rejected Plaintiff's demand.  *Id.* ¶ 108.  To date, Defendant has failed to return

the Structuring Deposit or compensate Plaintiff for its labor and expenses and, upon information

and belief, has not raised the $150 million for the Investment Fund.  *Id.* ¶¶ 108–09.

## PROCEDURAL HISTORY

Plaintiff initiated this case by Complaint filed on November 16, 2022.  Dkt. No. 1.  The

Complaint contains claims for (1) quantum meruit for the value of the Structuring Deposit and

the reasonable value of Plaintiff's labor and costs associated with providing its services in

attempting to source potential investment opportunities for the Defendant, *id.* ¶¶ 110–15;

(2) unjust enrichment in the amount of the Structuring Deposit, *id.* ¶¶ 116–23; (3) promissory

estoppel on the theory that Defendant made clear and unambiguous promises that it had secured

and was able to secure $150 million in investment capital and would compensate Plaintiff for its

labor and reimburse it for its expenses upon which Plaintiff relied, depriving it of a year's worth

of its labor and services for which it has not been paid and the value of the Structuring Deposit,

*id.* ¶¶ 124–33; and (4) negligent misrepresentation based on, among others, Defendant's

statements that money had been raised, a partnership would be formed, and Plaintiff would be

compensated for its work, *id.* ¶¶ 134–49.

On January 18, 2023, Defendant filed its motion to dismiss along with a memorandum of

law and a declaration in support of the motion.  Dkt. Nos. 17–19.  Plaintiff filed its memorandum

in opposition to the motion on February 1, 2023, Dkt. No. 24, and Defendant filed a reply

memorandum of law in further support of the motion on February 8, 2023, Dkt. No. 25.

## LEGAL STANDARD

On a 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the

complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See*

*York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002), *cert. denied*, 537

U.S. 1089 (2002).  This requirement "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009).  Thus, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."  *Id.*  A complaint must offer more than

"labels and conclusions," or "a formulaic recitation of the elements of a cause of action" or

"naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal.  *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  The ultimate question is whether "[a]

claim has facial plausibility, [*i.e.*] the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S.

at 678.  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact

to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."

*Twombly*, 550 U.S. at 556; *see also Matrixx v. Siracusano*, 563 U.S. 27, 46 (2011).

## DISCUSSION

### I.     Quantum Meruit and Unjust Enrichment

Defendant argues that Plaintiff's claims for quantum meruit and unjust enrichment both

fail because they are quasi-contractual causes of action and the existence of a valid and

enforceable written contract between the parties governing a particular subject matter ordinarily

precludes recovery in quasi-contract for events arising out of the same subject matter. Dkt. No. 18 at 5. Defendant notes that the Term Sheet between the parties is a valid contract and does not provide for Plaintiff to recoup the cost of its labor, out-of-pocket expenses, and the Structuring Deposit in the event a deal was not consummated. *Id.* at 6–7. Thus, Defendant argues that these claims fail as a matter of law.

"The Court 'analyze[s] quantum meruit and unjust enrichment together as a single quasi contract claim.'" *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 460 (S.D.N.Y. 2021) (quoting *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)). For these claims, "[t]he contract is a mere fiction, a form imposed in order to adapt the case to a given remedy." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (quoting *Bradkin v. Leverton*, 257 N.E.2d 643, 645 (N.Y. 1970)). "The law creates [the remedy of quasi-contract], regardless of the intention of the parties, to assure a just and equitable result." *Id.* (quoting *Leverton*, 257 N.E.2d at 645). "In order to recover in quantum meruit under New York law, a claimant must establish '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'" *Mid-Hudson Catskill*, 418 F.3d at 175 (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)). To prevail on a claim for unjust enrichment under New York law, a plaintiff must demonstrate "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (quoting *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)).

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc.*, 516 N.E.2d at 193.  Thus, "where a valid agreement exists between the parties, an action in quantum meruit to prevent unjust enrichment ordinarily is not available." *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011) (quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 118 (2d Cir. 2006)).  Likewise, it is black letter law that "[w]here the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded." *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009).  The law reflects the fundamental proposition that "[a] valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."  30 Williston on Contracts § 77:124 (4th ed. 2023).  The Restatement (Third) of Restitution and Unjust Enrichment explains:

> Contract is superior to restitution as a means of regulating voluntary transfers because it eliminates, or minimizes, the fundamental difficulty of valuation. . . . [T]he parties' own definition of their respective obligations—assuming the validity of their agreement by all pertinent tests—take precedence over the obligations that the law would impose in the absence of agreement.  Restitution is accordingly subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach.

Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011).

Those propositions, however, are subject to an important limiting principle.  *See id.* ("Judicial statements to the effect that 'there can be no unjust enrichment in contract cases' can be misleading if taken casually.").  The law respects the reasonable expectations of the parties. "In order for a contract to 'cover the dispute in issue' and thus bar a plaintiff's quasi-contract claims, [] the contract 'must specifically address' the actions that gave rise to the dispute.  That is

to say, the contract must 'clearly cover[] the dispute between the parties.'" *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 193–94 (S.D.N.Y. 2018), *adhered to on denial of reconsideration*, 2018 WL 6985207 (S.D.N.Y. Dec. 20, 2018) (internal citations omitted); *see also Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009). Where the contract does not clearly address the subject of the dispute, its existence will not bar a claim in quasi-contract.

For example, in *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Company*, 516 N.E.2d 190, the New York Court of Appeals held that the claim of a construction company in quasi-contract for the additional expenses it was forced to bear as a result of engineering design changes by the contractor was properly dismissed as the parties had entered into a contract that "clearly cover[ed]" the dispute between the parties. *Id.* at 193. In reaching its decision, the court stated that it was "undisputed that the relationship between the parties was defined by a written contract, fully detailing all applicable terms and conditions, and specifically providing for project design changes with adjustments in compensation contemplated in light of those changes." *Id.* at 389. In those circumstances, the court noted that the plaintiff could either have attempted to rescind the agreement for the defendant's breach of contract or performed under protest and sued for contract damages. *Id.* What it could not do was eschew the contract and the parties' own *ex ante* definition of their respective obligations and have the court define obligations for them under the theory of quasi-contract.

The Restatement (Third) of Restitution offers another example of when a contract will preclude recovery under quasi-contract:

> 4. A prepares preliminary designs and cost estimates for the construction of a bridge contemplated by City. The parties agree that A will be compensated for its services only if City decides to construct the bridge and to award the contract to A. The project is abandoned. Five years later City revives the project, using A's earlier

studies for planning purposes but awarding the contract to B.  A sues City for breach of contract and unjust enrichment, pointing out (correctly) that City has enjoyed the benefit of work for which A was never paid.  Yet City's use of A's plans without compensation is in accordance with the terms of the parties' valid agreement.  That being so, there is no unjust enrichment of City and no liability in restitution.

Restatement (Third) of Restitution and Unjust Enrichment § 2.

By contrast, in *Sternberg, Inc. v. Walber 36th St. Associates, 227*, 594 N.Y.S.2d 144 (1st Dep't 1993), the First Department held that a contract that provided that if plaintiff sold a building for no less than $11.5 million, plaintiff's commission would be $450,000 payable on closing, did not preclude the plaintiff's claim for quantum meruit seeking a commission where the building was sold for less than $11.5 million.  *Id.* at 145.  In doing so, the First Department overturned the decision of the trial court, which held that the contract barred recovery of a commission on a theory of quantum meruit.  The First Department distinguished the Court of Appeal's decision in *Clark-Fitzpatrick* stating that the contract in that case "was a written contract fully detailing all applicable terms and conditions of the agreement between the parties," whereas "the contract at issue here is silent as to plaintiff's entitlement to a commission in the event a sale of the building occurred for a lesser price." *Id.*  It continued:

> Obviously, if the brokerage agreement at issue had explicitly stated that, in the event the sale did not proceed at the agreed price, plaintiff would not be entitled to any commission, it would be indisputable that nothing short of a sale at that price would entitle plaintiff to a commission.  The contract, however, does not so state and is silent as to the plaintiff's entitlement to a commission in the event a sale occurred for a lesser price.

*Id.* at 146.

Similarly, in *Union Bank, N.A. v. CBS Corporation*, 2009 WL 1675087, the court addressed competing arguments about whether Plaintiff's quasi-contract claims should be dismissed because the parties had entered into agreements concerning a money funds account and the dispute arose from actions involving that account.  *Id.* at *6.  The court noted that the

central issue was whether the parties' agreements covered the subject matter of the dispute and that while the "[defendant] adopts a broad interpretation of the term 'subject matter,' [] the [plaintiff] maintains that the agreements must specifically address what happened here in order for the agreements to bar its quasi-contract claims." *Id.* at *7. The court held that plaintiff "has the better of the argument at this stage of the case" as "[d]ecisions interpreting *Clark-Fitzpatrick* have made clear that the predicate for dismissing quasi-contract claims is that the contract at issue 'clearly covers the dispute between the parties.'" *Id.* (citation omitted). The court noted that the agreement did not unambiguously cover the dispute between the parties and thus "the Court could later conclude that these agreements do not address the events that took place here." *Id.* at *8 & n.8.

These cases, and others, indicate that quasi-contractual claims should be dismissed at the motion to dismiss stage where a provision in a valid contract between the parties clearly covers the dispute between the parties. *See Andritz Hydro Canada, Inc. v. Rochester Gas & Elec. Corp.*, 2021 WL 3115425, at *10 (W.D.N.Y. July 22, 2021) (declining to dismiss complaint because "[a]t this stage, it is not clear to the Court that any provisions of the Agreement 'clearly controls' the determination of whether Andritz can recover currency hedging losses based on RG&E's post-suspension conduct"); *Vertex Const. Corp. v. T.F.J. Fitness L.L.C.*, 2011 WL 5884209, at *4 (E.D.N.Y. Nov. 23, 2011) ("And because it is difficult to determine the validity or scope of the contract at the pleading stage, courts routinely reject arguments like Retrofitness's as premature. The Court agrees that it cannot determine at this point whether any party will contest the validity of the contract or the extent to which the contract covers all work allegedly performed." (citation omitted)). It is not sufficient that the "services provided by the defendant and remedy sought by the plaintiff were traceable to a contract"; instead, the contract

must "specifically and expressly contemplate[] the factual scenario alleged to exist." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483 (S.D.N.Y. 2014); *see also CBS Corp.*, 2009 WL 1675087, at *7.

The rule that contract is superior to restitution derives from concerns of eliminating or minimizing the "fundamental difficulty of valuation." Restatement (Third) of Restitution and Unjust Enrichment § 2. In other words, where there is a contract that expressly outlines the parties' own definition of their respective obligations, then courts are loath, due to considerations of "both justice and efficiency," to override those obligations in favor of "obligations that the law would impose in the absence of agreement." *Id.* However, where the parties have entered into a contract that does not address the specific question at issue in the parties' dispute, it does not help minimize or eliminate the "fundamental difficulty of valuation" to hold that the contract precludes any claim that the dispute is governed by quasi-contractual relations between the parties. In fact, to do so could have the effect of actually upsetting the reasonable expectations of the parties and would promote unjust results. It would also run contrary to the Restatement's counsel that "[r]estitution claims of great practical significance arise in a contractual context, but they occur at the margins, when a valuable performance has been rendered under a contract [that] is otherwise ineffective to regulate the parties' obligations." *Id.*

The Complaint sufficiently alleges claims for unjust enrichment and quantum meruit. Although the parties do not appear to dispute that certain provisions in the Term Sheet bind the parties,[4] Dkt. No. 1 ¶ 24; Dkt. No. 18 at 3, these enforceable provisions of the Term Sheet do not

---

[4] The Term Sheet states that "except for" four of the provisions in the Term Sheet, the Term Sheet "is not intended to create any legally binding relationship between the Parties or any legal obligations on the part of either of them." Dkt. No. 1-1 at 3. The four binding provisions are: (1) structuring deposition; (2) expenses; (3) governing law; and (4) jurisdiction. Dkt. No. 1 ¶ 24.

"clearly cover[]'" the dispute over payment of labor costs and expenses.  *Dennis*, 343 F. Supp. 3d at 193–94.  The Term Sheet contemplates that Plaintiff's and Defendant's "reasonable legal, accounting, travel, and other professional service fees" will be paid using the "proceeds from the debt" "[u]pon the Close," and a right thereafter to have "budgeted G&A expenses associated with pre-deal expenses [to] be reimbursed."  Dkt. No. 1-1 at 3.  It does not speak to what will happen with respect to expenses if there is no close and it is entirely silent as to whether Plaintiff would be entitled to its costs of labor.  It also does not provide that Plaintiff "will be compensated for its services only if" the Transaction goes forward.  Restatement (Third) of Restitution and Unjust Enrichment § 2.  It thus does not clearly cover the subject here—whether Plaintiff is entitled to compensation for its out-of-pocket expenses and labor costs where the deal did not go through.[5]

The Court reaches the same conclusion with respect to the Structuring Deposit.  The Term Sheet provides in a section titled "Structuring Deposit" how much and on what timetable Plaintiff must pay to Defendant the "Structuring Deposit."  Dkt. No. 101 at 3.  It provides:

> Upon signing this Term Sheet, Company shall pay the Structuring Agent a Structuring Deposit of 100,000 per month, for a maximum of 6 months, followed by $70,000 for each of months 7 and 8.  For clarity, the Structuring Deposit is only paid until the Close, or month 8, whichever comes sooner[.]

---

[5] Defendant's motion to dismiss each of the quasi-contract claims is based solely upon the existence of the Term Sheet, and Defendant does not dispute that the Complaint sufficiently alleges that Plaintiff had a "reasonable expectancy of receiving compensation."  *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 513 (S.D.N.Y. 1997).  Parties to a contract routinely provide services "gratuitously in the hope that there would be a transaction and value would be returned."  *Ruby Has LLC*, 565 F. Supp. 3d at 461.  However, here, Plaintiff alleges that, prior to the signing of the Term Sheet, Defendant told Plaintiff that it would "fully compensate Frio Energy Partners for its [G&A] costs and any other reasonable out-of-pocket expenses incurred in sourcing investment opportunities and performing work for FTL from January 2022 forward."  Dkt. No. 1 ¶ 17(e).

*Id.*  It contemplates that the Structuring Deposit will function as a credit against the fees owed by Plaintiff to Defendant upon close.  *Id.*

The Term Sheet does not contain a binding provision addressing whether the Structuring Deposit will be returned to Plaintiff if Defendant fails to raise the $150 million for the Investment Fund and there is no close—*i.e.*, the circumstances at issue here.  The only provision that the Term Sheet contains concerning repayment of the Structuring Deposit is titled "Early Termination."  *Id.*  It states:

> If either party chooses not to proceed with the Transaction at any stage, it shall notify the other party in writing as soon as reasonably practicable.
>
> If Investor chooses not to proceed, then [80%] of the company-paid Structuring Deposit will be refunded.
>
> If the Company chooses not to proceed, then [75%] of the Structing Fee prorated for 6 months, shall be considered fully earned and the unpaid balance payable immediately.

*Id.*  Although this provision addresses the circumstance in which either party *chooses* not to proceed with the deal, it does not address the circumstance where the deal falls apart due to the Investor's inability to raise the contemplated funds or the parties' mutual failure to finalize an agreement.  Instead, it is silent as to what happens to the Structuring Deposit in that outcome.

The "Early Termination" provision also does not appear to be one of the binding provisions in the Term Sheet.  As noted, the Term Sheet explicitly provides in a section titled "Binding Provisions" that it is "not intended to create any legally binding relationship between the Parties or any legal obligations on the part of either of them" except with respect to four specific provisions.  *Id.*  Those four binding provisions are:  (a) "Structuring Deposit," (b) "Expenses," (c) "Governing Law"; and (d) "Jurisdiction."  *Id.*  The titles of these four "legally binding" provisions match up with titles of specific sections of the Term Sheet.  It therefore appears that the reference to the "Structuring Deposit" provision in the "Binding

20

Provisions" section refers only to the section of the agreement titled "Structuring Deposit," which, as described, provides for the amounts and schedule by which the Structuring Deposit must be paid.  It is another section—titled "Early Termination"—that provides under what limited circumstances the Structuring Deposit may be refunded.  There thus does not appear to be any binding contractual provision that governs when and, under what circumstances, the Structuring Deposit shall be returned to Plaintiff.

For these reasons, the Term Sheet does not clearly cover the present dispute over the Structuring Deposit.  Accordingly, Defendant's motion to dismiss the quantum meruit and unjust enrichment claims is denied.

## II.    Promissory Estoppel

Defendant argues that Plaintiff's third "count" for promissory estoppel should also be dismissed.  Dkt. No. 18 at 7–8.

In its third count, Plaintiff alleges that Defendant made clear and unambiguous promises that (1) it either had or would be able to secure $150 million in investment capital; (2) that it would execute a formal partnership agreement with Plaintiff soon after signing the Term Sheet; (3) that it would fund the purchase of the Max Permian Transaction for $10.5 million; and (4) that it would pay Plaintiff for its services and labor.  Dkt. No. 1 ¶ 125.  Plaintiff alleges that it reasonably relied on those representations in light of the Term Sheet and that as a result Plaintiff provided more than a year's worth of labor and services for which it had not been compensated and paid the $740,000 Structuring Deposit in cash to FTL.  *Id.* ¶¶ 126–33.

In moving to dismiss this count, Defendant contends that promissory estoppel is a narrow doctrine which generally only applies where there is no written contract.  Dkt. No. 18 at 7–8. Defendant contends that Plaintiff cannot seek an end run around the Term Sheet, which does not

provide for a return of the Structuring Deposit or payment for expenses under the circumstances at issue.  *Id.*

Defendant's general proposition is correct.  "To state a cause of action for promissory estoppel, the Plaintiffs must allege 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'"  *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 993 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir. 1984)).  Although a form of quasi-contract, promissory estoppel differs from quantum meruit and unjust enrichment in that it turns not on the nature of the benefit received by the defendant but upon the clarity and definitiveness of its promise and change in the plaintiff's position as a result of that promise.  *See Drummond v. Akselrad*, 2023 WL 3173780, at *11 (S.D.N.Y. May 1, 2023) (citing Marco J. Jimenez, *The Many Faces of Promissory Estoppel: An Empirical Analysis Under the Restatement (Second) of Contract*, 57 UCLA L. Rev. 669, 676 (2010)).  "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel.'"  *Kilgore v. Ocwen Loan Serv., LLC*, 89 F. Supp. 3d 526, 534 (E.D.N.Y. 2015) (quoting *Bd. of Trs. Ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, 2012 3930112, at *6 (S.D.N.Y. Sept. 10, 2012)).

"Promissory estoppel . . . is a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason."  *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017) (quoting *Paxi, LLC v. Shiseido Americas Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009)).  "If terms of an unambiguous contract are inconsistent with the statements that form the basis of the claim, the claiming party could not have reasonably relied on those statements as a

matter of law." *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, 2008 WL 650403, at \*11 (S.D.N.Y.
Mar. 7, 2008).  For example, if an agreement between the parties contains an unambiguous no-
oral-modification clause, then courts have held that a party could not have reasonably relied on
the alleged oral promises that comprised its promissory estoppel claim.  *See Randolph Equities,
LLC v. Carbon Cap., Inc.*, 648 F. Supp. 2d 507, 524 (S.D.N.Y. 2009); *MBNA Am. Bank, N.A.*,
2008 WL 650403, at \*12.

Plaintiff fails to state a claim in promissory estoppel with respect to the Structuring
Deposit.  Although the fact and content of the Term Sheet are not sufficient to defeat Plaintiff's
claim in quantum meruit and unjust enrichment, they fatally undermine Plaintiff's claim in
promissory estoppel.  Plaintiff claims that it paid the $740,000 Structuring Deposit to Defendant
based on promises including that Defendant had "either secured or was able to secure
$150 million in investment capital" and would "execute a formal partnership agreement with
Frio Energy Partners soon after signing the Term Sheet."  Dkt. No. 1 ¶ 125.  Plaintiff alleges that
Defendant made these promises orally during a conference call in July 2021 in which FTL
represented that "FTL had already raised some capital and had firm commitments to raise the
remaining capital to close the Investment Fund with at least $150 million of deployable capital
by January 2022" and that "FTL would execute a formal partnership agreement with Frio Energy
Partners by the end of January 2022 or soon thereafter in exchange for Frio Energy's agreement
to contribute up to $740,000 as an advance deposit."  *Id.* ¶ 17.

Before Plaintiff paid the Structuring Deposit, however, it was confronted with and agreed
to the August 6, 2021 Term Sheet.  Although Plaintiff alleges that the provisions in the Term
Sheet that (1) the "fund size" will be $150 million and (2) that the Close was "initially targeted
herein for 15 January 202[2]," *id.* ¶¶ 20, 23, support its claim for promissory estoppel, the full

content of that document is inconsistent with its claim.  While the Term Sheet requires Plaintiff

to provide the full amount of the Structuring Deposit to Defendant, Dkt. No. 1-1 at 3, it expressly

relieves Defendant of any obligation to enter into any transaction or to commit to engage in the

transaction, *id.* at 1.  Accordingly, when Plaintiff paid the Structuring Deposit, it knew that

Defendant might not sign a formal partnership agreement and that, regardless whether Defendant

had raised any funds, an agreement might not be consummated.  Thus, in light of the plainly

conflicting language in the Term Sheet, as a matter of law, Plaintiff could not have reasonably

relied on earlier oral statements that Defendant would close the Investment Fund in entering into

the Term Sheet and agreeing to pay the Structuring Deposit.  *See Paxi, LLC*, 636 F. Supp. 2d at

288 ("[A] promissory estoppel claim requires that reliance be reasonable, and '[u]nder New York

law reasonable reliance is precluded when an express provision in a written contract contradicts a

prior alleged representation in a meaningful fashion.'" (quoting *Thayer v. Dial Indus. Sales. Inc.*,

85 F. Supp. 2d 263, 272 (S.D.N.Y. 2000))); *Elliot v. Nelson*, 301 F. Supp. 2d 284, 286, 288

(S.D.N.Y. 2004) (holding that the plaintiff could not have reasonably relied upon the defendants'

earlier oral promises that they would raise the full amount of the venture fund as plaintiff's later-

signed employment contract specifically contemplated that the venture capital fund might not be

raised).

It is irrelevant, under these circumstances, that the Term Sheet provisions that are

inconsistent with the alleged promises are not binding.  The Term Sheet does not defeat the

claim for promissory estoppel because there is a contract provision which Plaintiff can invoke

that addresses Plaintiff's claim and provides an agreed-upon measure of relief.  It defeats the

claim for promissory estoppel because the provisions of the Term Sheet which were presented to

Plaintiff prior to it providing the Structuring Deposit render any alleged statement by Defendant

ambiguous and make any reliance upon Defendant's earlier statements unreasonable as a matter of law.  *See MBNA Am. Bank, N.A.*, 2008 WL 650403, at *11; *see also Elliot*, 301 F. Supp. 2d at 288; *Kaplan v. Cap. Co. of Am. LLC*, 747 N.Y.S.2d 504, 506 (1st Dep't 2002) ("Plaintiff's remaining claims, to recover bonus compensation [on the theory of] promissory estoppel [is] without merit.  Given the circumstance that plaintiff had no contractual right to a bonus and was clearly apprised of, and acknowledged in writing that he understood, the company policy that the payment of bonus compensation was purely discretionary, none of these theories is viable."). Plaintiff's claim is analogous to that addressed by the First Circuit in *Trifiro v. New York Life Insurance Company*, in which the court affirmed a grant of summary judgment dismissing a promissory estoppel claim on the grounds that the alleged promise was inconsistent with that made in a later non-binding statement.  845 F.2d 30, 33–34 (1st Cir. 1988).  The court there stated: "[c]onfronted by such conflict a reasonable person investigates matters further; he receives assurances or clarification before relying.  A reasonable person does not gamble with the law of the excluded middle, he suspends judgment until further evidence is obtained."  *Id.*; *see also AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 928 F.3d 110, 125 (1st Cir. 2019) (same); *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 665 (6th Cir. 2013) ("A plaintiff unreasonably relies on one of the defendant's statements if another of the defendant's statements contradicts it."); *NM IQ LLC v. OmniSky Corp.*, 820 N.Y.S.2d 7, 8 (1st Dep't 2006).

Plaintiff's allegations that Defendant subsequently, after the Term Sheet was entered into, made further promises to Plaintiff that it had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022 fail for a different reason.  Dkt. No. 1 ¶ 30.  Plaintiff did not pay the Structuring Deposit as a result of those promises.  Plaintiff was already obligated under the Term Sheet to pay the Structuring Deposit to

Defendant.  Its payments to Defendant of the Deposit were therefore pursuant to that Term Sheet and not on the basis of Defendant's subsequent statements concerning its ability to secure the requisite capital.

Plaintiff's claim for promissory estoppel based on the alleged promise that Defendant would be paid for its expenses and services, however, states a claim for relief.  This claim is premised on allegations that "FTL agreed that Frio Energy Partners should be compensated for its labor and out-of-pocket expenses and that FTL would compensate FTL accordingly."  *Id.* ¶ 131.  Plaintiff alleges in the Complaint that during a July 2021 conference call prior to the execution of the Term Sheet, Defendant represented to Plaintiff that "FTL would fully compensate Frio Energy Partners for its general and administrative ("G&A") costs and any other reasonable out-of-pocket expenses incurred in sourcing investment opportunities and performing work for FTL from January 2022 forward."  *Id.* ¶ 17(e).  This promise is not inconsistent with anything in the Term Sheet.  As noted, while the Term Sheet outlines how certain expenses will be paid or reimbursed upon the close of the transaction or after the close of the transaction, Dkt. No. 1-1 at 3, it is entirely silent about how and whether Plaintiff's expenses or the cost of Plaintiff's services will be paid/reimbursed if a deal does not go through.  Thus, it is not inconsistent with the alleged promise.

## III.    Negligent Misrepresentation

Defendant moves to dismiss Plaintiff's claim for negligent misrepresentation.  Plaintiff alleges that Defendant made the following negligent misrepresentations to it: (1) it had secured the $150 million in investment capital; (2) it would execute a formal partnership agreement with Plaintiff soon after signing the Term Sheet; (3) it would fund the Max Permian Transaction valued at approximately $10.5 million, which was sourced, researched, and negotiated by Plaintiff; and (4) it would pay Plaintiff for its services and labor incurred on its behalf.  Dkt.

No. 1 ¶ 135.  Plaintiff alleges that it suffered injury based on the misrepresentations as it "spent countless hours and incurred significant expenses attempting to source, research, and close various oil and gas investment opportunities for FTL's benefit and paid $740,000 into an investment fund that never existed." *Id.* ¶ 149.

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

A party who without sufficient care circulates "a thought" or launches a statement with "the explosive power resident in words" is not thereby rendered liable "in an indeterminate amount for an indeterminate time to an indeterminate class" of all persons who are exposed to the thought of statement and come to rely upon it. *Ultramares Corp. v. Touche*, 174 N.E. 441, 444–45 (N.Y. 1931) (Cardozo, J.).  "[M]isstatements are actionable only if the defendant is 'under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiffs' reliance upon the information [is] foreseeable.'" *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Heard v. City of New York*, 623 N.E.2d 541, 545 (N.Y. 1993)).  Moreover, "not all representations made by a seller of goods or provider of services will give rise to a duty to speak with care." *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996).  "In the commercial context, liability for negligent representation is imposed 'only on those persons who possess unique or specialized expertise, or who are in a

special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'" *ICD Cap., LLC v. CodeSmart Holdings, Inc.*, 842 F. App'x 705, 706 (2d Cir. 2021) (quoting *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 187).

"The existence of a special relationship is a 'fact-intensive, case-by-case inquiry; however, this has not precluded courts from dismissing claims due to a failure to adequately plead this element." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 452 (S.D.N.Y. 2017) (internal citations omitted).  In determining whether a special relationship has been adequately pleaded, courts must assess whether (1) the person making the representation held or appeared to hold unique or special expertise; (2) a special relationship of trust or confidence existed between the parties; and (3) the speaker was aware of the use to which the information would be put and supplied it for that purpose.  *Kimmell*, 675 N.E.2d at 454.  As to the second element, "[t]he special relationship requires a closer degree of trust than that in an ordinary business relationship."  *Wright v. Selle*, 811 N.Y.S.2d 525, 527 (4th Dep't 2006).  As to the third element, "[u]nder New York Law [] a negligent representation must be made 'for the very purpose of inducing action,' and the action may not be merely 'an indirect or collateral consequence thereof.'" *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 583 (2d Cir. 2005) (citation omitted); *see Genetec, Inc. v. PROS, Inc.*, 2021 WL 4311208, at *8 (S.D.N.Y. Sept. 21, 2021); *see also B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 483–84 (S.D.N.Y. 2010).

Following *Ultramares*, the New York Court of Appeals has identified the following criteria for liability:

> (1) awareness that the [representations] were to be used for a particular purpose or purposes; (2) reliance by a known party or parties in furtherance of that purpose; and (3) some conduct by the defendants linking them to the party or parties and evincing defendant's understanding of their reliance.

*Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 539 N.E.2d 91, 95 (N.Y. 1989); *see Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118, *amended*, 489 N.E.2d 249 (N.Y. 1985); *see also I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 543 (S.D.N.Y. 2017).

Defendant argues that Plaintiff has not pleaded an element of a claim for negligent misrepresentation. Dkt. No. 18 at 8–9. Specifically, Defendant argues that Plaintiff fails sufficiently to allege a special relationship between the parties to meet the first element of negligent misrepresentation, as the only relationship between the parties was the Term Sheet. *Id.* at 9. In its opposition to Defendant's motion to dismiss, Plaintiff does not claim that the special relationship existed prior to or as a result of the Term Sheet. Instead, Plaintiff contends that special relationship was formed after the Term Sheet was signed. Plaintiff states that "the special relationship alleged between Frio and FTL results from FTL's [] conduct and representations" "subsequent" to the signing of the Term Sheet and that it has "adequately alleged a special relationship based on extensive conduct that occurred after the Term Sheet was entered into." Dkt. No. 24 at 9. Plaintiff claims that this special relationship arose after the Term Sheet was signed based on the fact that "a special relationship was created based on the parties' extensive dealings, including continuous representations that FTL made to Frio, for nearly a year after the Term Sheet was executed." *Id.* at 6.

Plaintiff's claim based on pre-Term Sheet misrepresentations and misrepresentations in the Term Sheet is deemed abandoned and dismissed. "The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim." *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 328 (S.D.N.Y. 2018) (quoting *Johnson v. City of New York*, 2017 WL 2312924, at *18 (S.D.N.Y. May 26, 2017)); *accord Colbert v. Rio Tinto PLC*, 824 F. App'x 5,

11 (2d Cir. 2020) ("As a general matter, district courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition at the motion to dismiss stage.").

Plaintiff alleges four misrepresentations made after the parties entered into the Term Sheet. The Court will address each in turn.[6]

First, the Complaint alleges that after the Term Sheet was signed, on or about October 22, 2021, Plaintiff requested that Defendant provide proof of capital to show potential third-party sellers that Defendant was a legitimate buyer capable of bidding, that Defendant dissuaded Plaintiff from conducting further inquiry into Defendant's ability to secure financing or proof of the actual amount of capital available through the Investment Fund, and that Defendant verbally assured Plaintiff that "it had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022." Dkt. No. 1 ¶¶ 28–30. The Complaint further alleges that at that time, Defendant knew or had reason to know that it did not have the requisite $150 million of capital to invest and yet made these statements so that Plaintiff would rely on them to continue vetting and sourcing additional investment opportunities and continue to make the monthly payments to Defendant toward the Structuring Deposit. *Id.* ¶ 31. As a result of these representations, Plaintiff allegedly began searching for potential investment opportunities and performing due diligence on the opportunities it found, with Defendant's full knowledge and approval. *Id.* ¶¶ 35–36.

The claim fails for reasons other than the existence of a special relationship. To state a claim for negligent misrepresentation, "the alleged misrepresentation must be factual in nature

---

[6] To the extent Plaintiff claims that the injury it suffered from any of these post-Term Sheet misrepresentations was its payment of the Structuring Deposit, that aspect of the claim is dismissed. At the time it had entered into the Term Sheet, Plaintiff was already contractually obligated to make payments of the Structuring Deposit. Dkt. No. 1-1. Plaintiff therefore cannot plausibly allege that it relied on these post-Term Sheet misstatements in making such payments.

and not promissory or relating to future events that might never come to fruition." *Trafalgar Power Inc.*, 227 F.3d at 20–21. "Promises of future conduct are not actionable as negligent misrepresentations." *Murray v. Xerox Corp.*, 811 F.2d 118, 123 (2d Cir. 1987). Here, the alleged statement that Defendant "had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022" is promissory in nature. Dkt. No. 1 ¶¶ 28–30. That Defendant had not secured the requisite capital on the date Defendant made the statement would not have rendered the statement false. Defendant promised only to secure the minimum requisite capital at some time in the future, specifically by January 2022. Thus, at the time it was made, the statement was a promise "to make something happen in the future"—*i.e.*, to raise the requisite capital. *See Am. Fed'n of Musicians & Employers' Pension Fund v. Neshoma Orchestra & Singers, Inc.*, 2018 WL 2338764, at *9 (S.D.N.Y. May 23, 2018), *aff'd*, 974 F.3d 117 (2d Cir. 2020). It was not a statement of existing fact and therefore is "not actionable." *Id.*

Second, Plaintiff alleges that, on or about October 22, 2021, Defendant gave Letters of Commitment to Plaintiff addressed to third-party sellers that stated that "FTL had partnered with Frio Energy Partners and had an initial commitment of $150 million in capital available to fund purchases of non-operated working interests in oil and gas producing properties in the Permian Basin" and that based on these representations Plaintiff "reasonably believed that FTL had partnered with Frio Energy Partners and that FTL was in a financial position to fund potential investment opportunities and already had an initial commitment for $150 million."[7] Dkt. No. 1

---

[7] The statement that Defendant had a "commitment" of $150 million is arguably a statement of present fact. Therefore, the Court does not *sua sponte* dismiss the negligent misrepresentation claim based on this statement for the same reason as it dismissed the claim based on the statement that Defendant "had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022."

¶¶ 33–34, 139.  At the time, Plaintiff was concerned, as Defendant knew, that Defendant did not have sufficient capital to be "a legitimate buyer capable of bidding and acquiring multi-million-dollar oil and gas assets that were available for sale."  *Id.* ¶ 28.  Plaintiff also alleges that at that time, Defendant "knew or had reason to know that it had not secured the minimum requisite $150 million of capital to invest through the Investment Fund."  *Id.* ¶ 31.

Plaintiff has stated enough to give rise to a plausible inference that the parties had a special relationship at the time and to support a claim for negligent misrepresentation in connection with the Letters of Commitment.  Courts have previously found that a special relationship existed for purposes of a negligent misrepresentation claim where "[t]he defendants' representations to the plaintiff[] . . . clearly evinced awareness that the representations were to be used for the purpose of the investment," "[t]he plaintiffs allegedly relied on the defendants' representations," and the defendants invited reliance.  *I.B. Trading, Inc.*, 280 F. Supp. 3d at 543; *see also Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 453.  Although the Letters of Commitment were addressed to persons other than Plaintiff, Plaintiff was not just a downstream recipient of the Letters of Commitment whose existence and reliance would have been unknown to Defendant.  Instead, taking the allegations in the Complaint as true, Defendant was aware both that the Letters were needed by Plaintiff for a "particular purpose" and that Plaintiff intended to rely on them in furtherance of that purpose.  *Credit All. Corp.*, 483 N.E.2d at 118.  Plaintiff allegedly requested the Letters to help it "continue sourcing, vetting, and securing investment opportunities with third-parties."  Dkt. No. 1 ¶¶ 28, 32.  The particular purpose was for the Plaintiff and the third-party sellers to engage in discussions toward a potential transaction.  According to the Complaint, information about Defendant's capital commitments was needed by Plaintiff and the third-party sellers as an assurance that Defendant was a good faith bidder.

Defendant allegedly was aware of Plaintiff's intention itself to rely on the Letters of Commitment. The Letters of Commitment were provided in the immediate aftermath of Plaintiff's expression of concern regarding Defendant's financing and in response to that concern. If Defendant represented that it had the requisite capital, then Plaintiff and the sellers would both rely on that information—as they did—and engage in discussions concerning a potential sale. The allegations also point to a link between Plaintiff and Defendant, "which evinces [Defendant's] understanding of [Plaintiff's] reliance." *See Credit All. Corp.*, 483 N.E.2d at 118. The Letters of Commitment were delivered by Defendant to Plaintiff in response to queries by Plaintiff regarding whether Defendant had sufficient capital to bid for the transactions and at a time when, as Defendant knew, Plaintiff was planning to expend efforts and incur expense to arrange for the transactions on the understanding that Defendant had the requisite capital. Defendant also allegedly dissuaded Plaintiff from conducting further inquiry into FTL's ability to secure financing or proof of the actual amount of capital available through the Investment Fund. Dkt. No. 1 ¶ 29. Under these circumstances, and taking the allegations as true, it is plausible that—while the third parties were the nominal addressees of the Letters—the Letters of Commitment were drafted for the benefit also of Plaintiff and that Plaintiff's reliance on the letters was not merely incidental or collateral, *see Ultramares*, 174 N.E. at 446, but a "primary, if not the exclusive, *end aim*" of the Letters, *Credit All. Corp.*, 483 N.E.2d at 120 (emphasis in original).

In addition, at the time of the Letters of Commitment, the Complaint alleges that Defendant held or appeared to hold unique or special expertise. The Complaint alleges that Defendant held or appeared to hold unique or special expertise in raising investment capital and held itself out to Plaintiff "as having special knowledge about the amount of capital that was or

would be available for the Investment Fund." Dkt. No. 1 ¶¶ 27, 137.  Holding unique or special expertise in raising investment capital "amounts to nothing more than knowledge of the particulars of the company's business—and of the true situation underlying the misrepresentations pertaining to that business.  This does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context."  *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 402 (S.D.N.Y. 2004) (Lynch, J.); *see also Tradeshift, Inc. v. Smucker Servs. Co.*, 2021 WL 4463109, at *8 (S.D.N.Y. Sept. 29, 2021) ("[A] defendant's 'superior knowledge of the particulars of its own business practice is insufficient' to establish a special relationship, and '[g]enerally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties.'" (citation omitted)).  But Plaintiff alleges more than that Defendant held or appeared to hold unique or special expertise in raising investment capital.  Plaintiff also alleges that Defendant had "special knowledge about the amount of capital that was or would be available for the Investment Fund."  Dkt. No. 1 ¶¶ 27, 137.  According to the Complaint, it was Plaintiff's role to source opportunities, while Defendant worked on raising the requisite capital.  *Id.* ¶¶ 9–11, 35.  Defendant therefore would have had special knowledge about that effort.  Taking the allegations as true, Defendant would have special knowledge about the level of interest from investors, how certain those investors were to invest (including based on Defendant's prior relationships with them), and the timetable of any potential investments.

The Complaint also sufficiently alleges a special relationship of trust or confidence existed between the parties at the time the Letters of Commitment had been sent.  At that time, according to the Complaint, Plaintiff and Defendant were plausibly no longer strictly acting at arms' length.  *See Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir.

2001) (reversing dismissal of negligent misrepresentation claim where "[p]laintiff's complaint implies a relationship between the parties that extended beyond the typical arm's length business transaction.").  Months prior, they had entered into a Term Sheet in which Plaintiff agreed to pay a large deposit so that they could start sourcing deals.  Dkt. No. 1-1; *see also Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 811 (1st Dep't 1976) ("Surely the formation of a new corporation, with paid in capitalization of $500,000, created for the sole purpose of marketing a new product of Cyanamid's attests the parties' relationship was intrinsically a more intimate association, at least in terms of reliance and trustworthiness, than that of the commonly encountered buyer and seller.").  The Term Sheet also did not just contemplate "an ordinary contractual relationship."  *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*, 819 F. Supp. 1282, 1293 (S.D.N.Y. 1993), *aff'd*, 57 F.3d 146 (2d Cir. 1995).  Instead, it outlined a seemingly long-term partnership between the parties where representatives of each would sit on the Investment Committee and "jointly develop a set of parameters to define Projects which may be acquired with the Fund."  Dkt. No. 1-1 at 1.  Moreover, after the Term Sheet had been signed and prior to the Letters of Commitment being provided, the parties had a months' long relationship with one another, seemingly involving multiple conversations.  *See generally* Dkt. Nos. 1, 1-1, 1-2.  As a result of these conversations, Defendant instilled in Plaintiff the confidence for Plaintiff to start sourcing deals for it—even though the exact nature of their relationship had not been set down in final transaction documents.  This conclusion is further supported by the fact that Defendant itself described its relationship with Plaintiff in its Letters of Commitment to the third parties as that of a "partner[ship]."  Dkt. No. 1-2.

For these reasons, the *Kimmell* factors sufficiently support the existence of a special relationship between the parties at the motion-to-dismiss stage.  "[S]ince the determination of

whether a special relationship exists is essentially a factual inquiry," Plaintiff should be given the chance to develop this claim through discovery. *See Suez Equity Invs., L.P.*, 250 F.3d at 103. Accordingly, the Court denies the motion to dismiss the claim for negligent misrepresentation based on the Letters of Commitment.[8]

Third, the Complaint alleges that after Defendant admitted to Plaintiff that it had authorized bids on prior projects without having secured the full $150 million funds, Plaintiff asked Defendant multiple times to confirm that Defendant had actually raised the necessary funds before moving forward with placing a bid on the Max Permian Transaction, valued at approximately $10.5 million. Dkt. No. 1 ¶ 76. The Complaint further alleges that in response, Defendant represented or about May 24, 2022 to Plaintiff that it had raised the requisite capital to fund the Max Permian Transaction and, as a result of that representation, Plaintiff funded the deposit for the Transaction and conducted due diligence on it. *Id.* ¶ 77. The Complaint also states that "[o]n July 12, 2022, FTL informed Frio Energy Partners for the first time that, despite its prior assurances and representations, FTL did not have the necessary funds to close the Max Permian Transaction for $10.5 million on July 15, 2022." *Id.* ¶ 82.

---

[8] Contrary to Defendant's claim in its motion to dismiss, this case is not similar to *Winnick*, 350 F. Supp. 2d at 401. In that case, the court held that a relationship between a bank and a borrower did not constitute special relationship. Specifically, the court noted: "the relationship between a bank and a borrower is the very epitome of an arm's length commercial transaction: the borrower must comply with the negotiated terms of its contract, and may not defraud the lender by deliberate falsehood, but it is not liable in tort for mere carelessness about its representations. *Id.* at 402. The court, however, specifically noted that its holding did not extend to cases where the complaint alleged a "relationship of trust and confidence, above that created by the contracts involved." *Id.* at 403. Here, on the other hand, the Term Sheet imposed very few if any contractual obligations between the parties as it was largely nonbinding. Thus, taking the allegations as true, the relationship between the parties appears to have stemmed from something "above that created by the contract[] involved." *Id.*

This question whether "'the nature and caliber of the relationship between the parties'
was such that [Plaintiff's] alleged reliance on [Defendant's] misrepresentations was justified" at
this point in time is a close question. *Genetec, Inc.*, 2021 WL 4311208, at *8. At the time that
Defendant allegedly made these statements to Plaintiff, Plaintiff might have had specific reasons
no longer to trust Defendant. According to the Complaint, Defendant had previously
misrepresented its ability to raise funds and Plaintiff was aware of that misrepresentation. Dkt.
No. 1 ¶ 63. A defendant who has once made a misrepresentation, however, is not free to
continue to make misrepresentations regardless of the circumstances, with impunity. It is
plausible that Plaintiff continued to rely on Defendant notwithstanding its prior provision of
incorrect information. There are also allegations to support that Defendant had special
knowledge—not readily accessible to Plaintiff—concerning the funds it had available to it. In
addition, the allegations support that Defendant was aware of the use to which the information
would be put by Plaintiff and specifically supplied it for that purpose. In the Complaint, Plaintiff
alleges that it asked Defendant to confirm that it had raised the necessary funds before moving
forward with the bid on the Max Permian Transaction "multiple times," that Defendant *assured*
Plaintiff that it did have the requisite capital, and that Plaintiff, acting on the basis of that explicit
reassurance, conducted due diligence on the Transaction. *Id.* ¶¶ 74–82. In other words,
according to the Complaint, there was a relationship between the parties such that Defendant
knew that Plaintiff would rely on the information it provided for a particular purpose, and
Plaintiff did rely on it.

Moreover, as discussed, the allegations in the Complaint support that the relationship
between Plaintiff and Defendant at this point in time was no longer arms' length. Plaintiff had
sourced numerous deals for Defendant on the promise that they would engage in a joint business

together.  Such allegations are sufficient to state a claim that the parties were in privity and had a special relationship for purposes of a claim for negligent misrepresentation.  The Second Circuit has noted that "to the extent that a 'special relationship of trust' is sparsely pled," a claim of negligent misrepresentation should not be dismissed where "the complaint emphatically alleges the other two factors enunciated in *Kimmell*."  *Suez Equity Invs., L.P.*, 250 F.3d at 103.  Here, the Complaint sufficiently alleges the other two factors enunciated in *Kimmell* and, accordingly, Plaintiff is entitled to have the claim go forward.

Finally, Plaintiff alleges that "on or about July 15, 2022, FTL agreed to cover the out-of-pocket costs incurred by Frio Energy Partners immediately and promised that it would reimburse Frio Energy Partners' labor costs in the near future."  Dkt. No. 1 ¶ 88.  To the extent that Plaintiff's negligent misrepresentation claim is based on this alleged misrepresentation, it does not state a claim for relief.  To state a claim for negligent misrepresentation, Plaintiff must show "reasonable reliance on the information.'"  *Crawford*, 758 F.3d at 490.  Here, however, there is no allegation of how Plaintiff relied upon this statement.  At the time it was made, Plaintiff had apparently already sourced all of its deals for Defendant.  *See generally* Dkt. No. 1.  Moreover, as also noted, a negligent misrepresentation claim must be dismissed where it is "predicated upon promises of future conduct, rather than statements as to 'existing material fact.'"  *Capricorn Invs. III, L.P. v. Coolbrands Int'l, Inc.*, 886 N.Y.S.2d 158, 159 (1st Dep't 2009); *see also Neshoma Orchestra & Singers, Inc.*, 2018 WL 2338764, at *9.  The statement that Defendant promises to reimburse Plaintiff is a promise of future conduct and therefore nonactionable.

IV.     **Motion to Strike**

Defendant moves to strike (1) paragraphs of the Complaint that describe deals where Plaintiff was outbid or rejected by the seller; (2) the request for attorneys' fees; and (3) the demand for punitive damages.

Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Federal courts have discretion in deciding whether to grant motions to strike." *Capri Sun GmbH v. Am. Beverage Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. Oct. 29, 2019) (quoting *Orientview Techs. LLC v. Seven For All Mankind, LLC*, 2013 WL 4016302, at *3 (S.D.N.Y. Aug. 7, 2013)). "However, motions to strike under Rule 12(f) are generally 'disfavored and granted only if there is strong reason to do so.'" *Sweigert v. Goodman*, 2021 WL 603069, at *1 (S.D.N.Y. Feb. 16, 2021) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013)).

The motion to strike paragraphs 41–47, 53–60, and 71–73 of the Complaint is denied. These paragraphs concern situations in which Plaintiff was outbid by a competing purchaser or rejected by the seller. Defendant argues that the allegations are immaterial and impertinent because "the Complaint fails to specify how the deals that failed due to a competitor's bids are relevant to any causes of action," Dkt. No. 18 at 10, and because "the potential deals were not lost because Defendant allegedly had no funds," Dkt. No. 25 at 6. Plaintiff responds that the allegations are relevant because they describe Defendant's false representations that it had raised the money necessary to make the investments and failed to inform Plaintiff that "it was effectively penniless." Dkt. No. 24 at 10. The Second Circuit has instructed that "ordinarily" a district court should not "decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." *Lipsky v.*

*Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  "Usually the questions of

relevancy and admissibility in general require the context of an ongoing and unfolding trial in

which to be properly decided."  *Id.*; *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d

367, 398 (S.D.N.Y. 2006) ("The Second Circuit has made clear that district courts should be

wary when deciding whether to grant a Rule 12(f) motion on the ground that the matter is

impertinent and immaterial.").  "To prevail on a [Rule 12(f)] motion to strike, a party must

demonstrate that (1) no evidence in support of the allegations would be admissible; (2) that the

allegations have no bearing on the issues in the case; and (3) that to permit the allegations to

stand would result in prejudice to the movant."  *Kraiem v. JonesTrading Int'l Ltd.*, 2022 WL

204354, at *1 (S.D.N.Y. Jan. 24, 2022) (quoting *Acco, Ltd. v. Rich Kids Jean Corp.*, 2016 WL

3144053, at *1 (S.D.N.Y. Apr. 11, 2016)); *see also Porsch v. LLR, Inc.*, 380 F. Supp. 3d 418,

429 (S.D.N.Y. 2019) ("Motions to strike under Rule 12(f) 'should be denied unless the

challenged allegations have no possible relation or logical connection to the subject matter of the

controversy and may cause some form of significant prejudice to one or more of the parties to

the action.'" (quoting *VNB Realty, Inc. v. Bank of Am. Corp.*, 2013 WL 5179197, at *3

(S.D.N.Y. Sept. 16, 2013)).

   Defendant has demonstrated neither that the allegations have no possible factual or

logical connection to the action, nor that it would suffer prejudice from the allegations.  The

challenged paragraphs allege that Defendant gave Plaintiff authorization to bid on at least two of

the transactions, thereby conveying and leading Plaintiff to believe that it had raised the money

necessary to consummate the transactions.  Dkt. No. 1 ¶¶ 44–45, 55, 58.  As a result of these

assurances, Plaintiff continued to incur expenses and perform labor.  Although Defendant argues

that it would suffer prejudice in the form of having "to engage in expensive and time-consuming

discovery into the nitty gritty details of these potential deals and the ultimate outcome," Dkt. No. 25 at 6, that the allegations may require some amount of discovery is a necessary consequence of the fact that the allegations may have a bearing on the case.  The proper remedy if Plaintiff seeks unnecessary and expensive discovery into the "nitty gritty details" is a protective order under Rule 26(c).  It is not striking the allegations entirely from the case.

Next, Defendant moves to strike Plaintiff's request for reasonable and necessary attorneys' fees.  Rule 12(f) authorizes the court to strike from the pleadings a request for relief if the allegations and claims asserted would not support that form of relief.  *See Martinez v. Ketchum Advert. Co.*, 865 F. Supp. 166, 167–68 (S.D.N.Y. 1994).  "Under the American Rule, 'attorneys' fees are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'"  *Rapay v. Chernov*, 2017 WL 892372, at *9 (S.D.N.Y. Mar. 6, 2017) (quoting *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir. 2004)). "New York follows the American Rule."  *Id.*  "Nevertheless, even under the American Rule, courts retain the 'equitable power to make awards in addition to regular statutory costs, including a reasonable attorneys' fee,' in certain circumstances, such as if a party has acted in bad faith." *OneWest Bank N.A. v. Lehman Bros. Holding Inc.*, 2015 WL 1808947, at *3 (S.D.N.Y. Apr. 20, 2015) (quoting *Brookhaven Science Assoc., LLC v. Donaldson*, 2007 WL 2319141, at *4 n. 18 (S.D.N.Y. Aug. 9, 2007)).

As Defendant points out, the Term Sheet does not entitle Plaintiff to recovery of attorneys' fees and Plaintiff fails to allege a statutory right to attorneys' fees.  Dkt. No. 18 at 10. The Court, however, declines to strike the request for attorneys' fees.  "[C]ourts in this circuit have denied a defendant's motion to strike or to dismiss claims for attorney's fees even though the likelihood that plaintiff will be able to recover attorney's fees is small, because dismissal of

such claims at the pleading stage would be premature." *Lehman Bros. Holding Inc.*, 2015 WL 1808947, at *3 (quoting *SRSNE Site Grp. v. Advance Coatings Co.*, 2014 WL 671317, at *2 (D. Conn. Feb. 21, 2014)).

Finally, Defendant moves to strike the request for punitive damages.  A motion to strike a demand for punitive damages is properly granted "where such relief is unavailable as a matter of law." *Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020) (collecting cases).  Under New York law, punitive damages are not available on claims of promissory estoppel, quantum meruit and unjust enrichment.  *See LPD New York, LLC v. Adidas Am., Inc.*, 2022 WL 4450999, at *18 n.11 (E.D.N.Y. Sept. 24, 2022); *Rapay*, 2017 WL 892372, at *8; *Legurnic v. Ciccone*, 63 F. Supp. 3d 241, 251 (E.D.N.Y. 2014); *Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 981 F. Supp. 2d 153, 166 (E.D.N.Y. 2013); *Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989).  They are, however, available for claims of negligent misrepresentations where "the defendant's conduct evinces a high degree of moral turpitude and demonstrates such wanton dishonesty as to imply a criminal indifference to civil obligations." *Kemp v. Henry*, 2017 WL 1901433, at *2 (E.D.N.Y. May 6, 2017) (quoting *Hutchins v. Utica Mut. Ins. Co.*, 484 N.Y.S.2d 686, 688 (3d Dep't 1985)).  Because portions of Plaintiff's negligent misrepresentation claim have not been dismissed, the Court declines to strike the request for punitive damages at this time.

## CONCLUSION

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  The motion to strike is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 17.

SO ORDERED.

Dated: June 27, 2023
     New York, New York

_____
LEWIS J. LIMAN
United States District Judge