UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/15/2024
```

------------------------------------------------------------------X
:
FRIO ENERGY PARTNERS, LLC,                                        :
:
                                        Plaintiff,               :
:
                -v-                                              :           22-cv-9766 (LJL)
:
FINANCE TECHNOLOGY LEVERAGE, LLC,                                :           OPINION AND ORDER
:
                                        Defendant.               :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendant Finance Technology Leverage, LLC ("Defendant" or "FTL") moves for summary judgment against Plaintiff Frio Energy Partners, LLC ("Plaintiff" or "Frio Energy") pursuant to Federal Rule of Civil Procedure 56. Dkt. No. 82. For the following reasons, Defendant's motion is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise stated. They are construed in favor of Plaintiff, the non-moving party.

### I.    The Relevant Parties

Defendant FTL is a Delaware private equity firm formed in 2013. Dkt. No. 90 ¶ 1; Dkt. No. 83 at 4 (citing Dkt. No. 1 ¶ 9). FTL's management team includes Frederick Giarrusso, Ph.D., Chief Executive Officer, and Glen Surles, Director of Finance and Risk Management. Dkt. No. 90 ¶ 1.

Plaintiff Frio Energy is a Delaware limited liability company formed in 2021 by non-parties Aaron Davis and William Ditto for business related to oil and gas non-operating properties.[1]  *Id.* ¶ 2; Dkt. No. 93-1 at 70:16–17.  Davis and Ditto have experience related to the purchase, sale of, and investment in oil and gas non-operating properties; they describe themselves as "seasoned oil and gas veterans" who have founded and run at least three successful private-equity-backed oil and gas companies and at least two successful private-equity-backed mineral companies.  Dkt. No. 90 ¶¶ 2–3.

## II.    The Discussions Between Plaintiff and Defendant

In Spring 2021, FTL approached Davis about leading a team to assist FTL in sourcing and acquiring non-operating working interests in oil and gas investment opportunities in the Permian Basin, performing due diligence on those opportunities, negotiating their acquisition, and eventually developing them.  Dkt. No. 93-1 at 82:9–83:9; Dkt. No. 93-2; Dkt. No. 93-3 at 110:7–14; Dkt. No. 93-4 ¶ 3.[2]  At that introductory call, Davis stated that he was not presently in a position

---

[1] The parties use the terms "non-operating," "non-operative," "non-operated," and non-op seemingly interchangeably throughout their papers and the record to refer to primarily economic interests in oil and gas properties that do not require operation of the property.  The Court will use the term "non-operating" except in direct quotes.

[2] Much of Plaintiff's statement of the facts is based upon Davis' affidavit dated July 19, 2024. Dkt. No. 93-4; *see* Dkt. No. 88 at 2–9.  Defendant argues that "a party's conclusory statements, self-serving affidavits and unsubstantiated assertions are insufficient to overcome a motion for summary judgment."  Dkt. No. 91 at 1–2 (citing *Podell v Citicorp Diners Club, Inc.*, 112 F.3d 98, 101 (2d Cir. 1997); *Scotto v Almenas*, 143 F.3d 105, 114 (2d Cir. 1998); *Cestaro v Prohaska*, 681 F. Supp. 3d 121, 125 (S.D.N.Y. 2023)).  However, Defendant does not explain why any of Davis' averments should be considered "[a] conclusory contradiction of undisputed evidence in a self-serving affidavit, unsupported by other evidence."  *Cestaro*, 681 F. Supp. 3d at 125.  The affidavit generally does not contradict, but rather supplements, Defendant's statement of the facts and is submitted alongside supporting documents and testimony.  *See Savarese v. City of New York*, 547 F. Supp. 3d 305, 328 (S.D.N.Y. 2021) ("Plaintiff has not manufactured a fact issue only after the close of discovery when Defendant did not have an opportunity to challenge it.").  *See generally* Dkt. No. 89.  For the purposes of this motion, the Court disregards any conclusory statements as insufficient to forestall summary judgment, but recites the undisputed nonconclusory averments in Davis' affidavit.  *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (nonmovant satisfied his burden of "bring[ing] to the district court's attention some

to proceed but would "keep in touch if things change." Dkt. No. 93-1 at 83:10–84:2. Davis reconnected with FTL in June of 2021, and they began to discuss forming a formal business partnership. *Id.* at 84:3–6; Dkt. No. 93-4 ¶ 4. Plaintiff claims, and Defendant does not dispute, that as a result of that call, Davis and Ditto formed Frio Energy to work with FTL in the non-operating oil and gas space. Dkt. No. 93-1 at 81:13–82:1; Dkt. No. 93-4 ¶ 5.

### III.    Negotiation of the Term Sheet

During July and early August 2021, representatives of Plaintiff and Defendant negotiated a term sheet describing how they planned to work together in pursuit of acquiring non-operational oil and gas properties through a debt facility. Dkt. No. 90 ¶ 4; Dkt. No. 93-4 ¶¶ 3, 6.

On July 13, 2021, Defendant sent to Plaintiff what appears to be the first draft of the proposed Term Sheet. Dkt. No. 84-4. The draft Term Sheet contemplated the formation of a company backed by a $100 million debt facility that would invest in non-operating oil and gas properties. *Id.* Plaintiff and Defendant would share in the equity of the venture, with Defendant receiving a 60% equity position in the projects to be funded and Plaintiff the remaining 40%. *Id.* at 0245.[3] The draft Term Sheet contemplated Plaintiff would pay Defendant a structuring fee upon the closing of the transaction equal to 1% of the Fund Size and that, until the close (which was anticipated to be on January 15, 2022), Plaintiff would pay the Defendant a Structuring Deposit of $60,000 per month (equaling $300,000 based on the anticipated close of January 15, 2022). *Id.* On the debt facility, interest would accrue at a rate of 12% per annum on the drawn down portion of the funds, and there would be a $25 million drawdown at closing with additional drawdowns periodically thereafter. *Id.* at 0244–45. The paragraph on Equity Participation cross-referenced

---

affirmative indication that his version of relevant events is not fanciful" where he produced documentary evidence and affidavits).

[3] Where documents employ Bates numbering instead of traditional pagination, the Court refers to pages within such documents by the last four digits of the Bates number.

the section on Structuring Deposit, which stated in brackets: "[(Trade-off curve is $20,000 per month for each 10% of Equity Participation.)]" *Id.* at 0245. The initial draft also contemplated that Defendant's costs, but not Plaintiff's costs, would be covered by the resulting company formed by Plaintiff and Defendant after the close. It stated that "[u]pon the Close, Company will pay Investor's reasonable legal, accounting, travel, and other professional service fees, up to $500,000." *Id.* at 0246. It did not provide for the reimbursement of Plaintiff's expenses. *Id.*

Davis responded on Monday, July 19, 2021, with a redline of the draft Term Sheet and a suggestion that the parties speak on the telephone after Defendant had the time to digest the requests. Dkt. No. 84-6 at 1904.[4] The redline decreased Defendant's equity participation to 40% (thereby increasing Plaintiff's stake in the resulting entity), decreased the interest payments on the debt to 10% (thereby increasing the value of the equity), provided that Plaintiff would pay Defendant a Structuring Deposit of $25,000 per month until the close, and proposed that upon the close, both Plaintiff's and Defendant's expenses would be paid using the proceeds from the debt. Dkt. No. 84-6 at 1906–07. In a comment bubble attached to the changed expenses provision, Davis wrote: "Discussed that my side will have legal expenses and other items that will need to be reimbursed as well." *Id.* at 1907.

Surles thanked Davis for the July 19 redline and stated that they would schedule a call for later that week. Dkt. No. 84-7 at 1721. Surles also wrote "[a]ttached is a copy of the process diagram you requested" and attached a one-page "process diagram." *Id.* at 1721–22. The process

---

[4] Plaintiff states that "[i]t is unclear who proposed which changes in the Term Sheet negotiation because some of the changes Mr. Davis made to the Term Sheet may have been based on discussions with FTL, with Dr. Giarrusso asking Mr. Davis to make the changes rather than FTL doing it themselves." Dkt. No. 90 ¶¶ 15–18, 20; Dkt. No. 93-1 at 184:3–11. However, all of the referenced changes are in Plaintiff's favor and Plaintiff has not offered evidence to identify any of the changes it claims were requested by Defendant.

diagram contemplated that the investment committee and financial model would be created within 4–6 weeks, investment committee documents would be completed 4-6 weeks thereafter, a final term sheet and partner agreements would be completed 2–4 months later, final documents would be completed 2–4 weeks later, and funding would be provided 1–2 weeks after that. *Id.* at 1722.

Davis sent Defendant an updated draft Term Sheet on July 26, 2021. Dkt. No. 84-2. The draft contemplated that Defendant would retain a 40% equity interest in the company to be formed by Plaintiff and Defendant which would be funded by a $150 million debt facility that could be used to acquire interests in non-operating oil and gas development projects, with the option to increase the fund to $300 million with a mutual election. *Id.* at 1727–28. Plaintiff did not alter the provision stating that it would pay a Structuring Deposit of $25,000 per month until the close but proposed that "[a]t close there be a true up equal to $75,000 per month." *Id.* at 1729. Plaintiff added: "[i]f FTL is unable to raise a minimum of $100 mm then the $25,000 per month shall be refunded to the company." *Id.*; Dkt. No. 90 ¶ 7; *see also* Dkt. No. 84-3 at 179:22–180:12 (Davis testified that he understood that comment to mean "we would get our money returned to us."). If there was a close, the Structuring Deposit that had been paid to date would be applied to the Structuring Fee of 1% of the fund size due from Plaintiff to Defendant. The draft incorporated the proposal that both Plaintiff and Defendant's expenses up to $500,000 would be paid upon the close from the proceeds of the debt and stated: "G&A reimbursement upon closing to be discussed how it is to be funded (discussed prior pre-deals vs. post deals)." Dkt. No. 84-2 at 1729.

All of the draft term sheets reflected that the stated terms were merely indicative for discussion purposes and—except for the provisions related to the Structuring Deposit, expenses, governing law, and jurisdiction—did not create any legal obligations. Dkt. Nos. 84-2, 84-4, 84-6.

### IV.    The Term Sheet

The parties executed a term sheet ("Term Sheet") on August 6, 2021.  Dkt. No. 84-1.  The

Term Sheet states at the outset:

> This indicative Term Sheet indicates the basic parameters for a contemplated
> Transaction and is neither an offer nor a commitment to engage in the Transaction.
> Indicative terms herein are for discussion purposes, and do not represent final
> contractual wordings.  Final terms for the Transaction will be as expressed in a set
> of definitive documents at the close of the Transaction.

*Id.* at 1.  The Term Sheet contemplated a transaction in which Frio Energy or a related entity

(defined as the "Company") and FTL Capital Ltd. or a related entity (defined as the "Investor")

would invest in non-operating oil and gas properties based upon a set of parameters developed by

the Company and the Investor.  *Id.*  FTL was the "Structuring Agent."  *Id.*

Until the close, Frio Energy would pay FTL "a Structuring Deposit of $100,000 per month,

for a maximum of 6 months, followed by $70,000 for each of months 7 and 8."  *Id.* at 3; *see also*

*id.* ("For clarity, the Structuring Deposit is only paid until the Close, or month 8, whichever comes

sooner.").  Upon the close, Plaintiff was required to pay Defendant a Structuring Fee "by using

proceeds from the debt, a fee equal to 1% of the Fund Size, less any Structuring Deposit paid to

date."  *Id.* at 3.  Accordingly, the Structuring Deposit partially acted as a prepayment of the

Structuring Fee.  In addition, Defendant would receive a 40% interest in the equity position in the

projects that were approved.

The Term Sheet contemplated that interest on the drawn portion of the funds would accrue

at a rate of 10% per annum.  *Id.* at 2.  The Term Sheet stated that the Investment Fund would have

a $150 million debt facility with the option to increase to $300 million with a mutual election.  *Id.*

at 1; *see also* Dkt. No. 90 ¶ 19 (Plaintiff understood that the Investment Fund was a $150 million

debt facility with an insurance component); Dkt. No. 84-9 at 10:13–23 (Ditto testified that Davis

told him in July 2021 that the capital "was an insurance-related debt instrument that was

150 million."); Dkt. No. 90 ¶ 19 (same). Plaintiff would use those funds "to acquire interests in non-operated oil and gas development projects within the United States." Dkt. No. 84-1 at 1. The Term Sheet also provided that Plaintiff and Defendant would establish an Investment Committee composed of members from both the Company and the Investor to ensure that the project parameters were met. *Id.* The Term Sheet provided that each project required unanimous approval of the Investment Committee prior to an acquisition. *Id.*

The Term Sheet stated that funds would be available for eighteen months following the close and that all debt was to be repaid in full within five years of the close. *Id.* at 2. The Term Sheet stated that the close would be "initially targeted . . . for 15 January 202[2],"[5] but acknowledged that "this is a target, and not a guaranteed date." Dkt. No. 84-1 at 1.

Each side had the right not to proceed with the transaction "at any stage," by "notify[ing] the other party in writing as soon as reasonably practicable." *Id.* at 3. If the Investor chose not to proceed, "[80]% of the company-paid Structuring Deposit" would be refunded. *Id.* If the Company chose not to proceed, "then [75]% of the Structing [*sic*] Fee, prorated for 6 months, shall be considered fully earned and the unpaid balance payable immediately." *Id.*

The Term Sheet provided the following with respect to expenses:

Upon the Close, Company, by using proceeds from the debt, will pay Investor's and Company's reasonable legal, accounting, travel, and other professional service fees, up to $500,000. After the Close, budgeted G&A expenses associated with pre-deal expenses will be reimbursed.

*Id.*

---

[5] The Term Sheet states that the close would initially be targeted for "15 January 2021." Dkt. No. 84-1. Plaintiff alleged that this was a typographic error and that it should have stated 2022. Dkt. No. 1 ¶ 23. Giarrusso testified that he concurred the 2021 date was in error and that the close was targeted for January 15, 2022. Dkt. No 93-17 at 169:14–170:10.

The Term Sheet stated that it was "a non exhaustive summary of the proposed terms and conditions of the Transaction." *Id.* Except for the provisions regarding the structuring deposit, expenses, governing law, and jurisdiction, it was "not intended to create any legally binding relationship between the Parties or any legal obligations on the part of either of them." *Id.*

## V. The Parties' Attempts to Find Investments and to Raise a Fund

Beginning in August 2021, Plaintiff began making cash payments toward the Structuring Deposit. Dkt. No. 93-6; Dkt. No. 93-4 ¶ 11. By March 14, 2022, Plaintiff finished its monthly payments and the $740,000 Structuring Deposit was fully paid. Dkt. No. 93-6; Dkt. No. 93-4 ¶ 11.

In planning calls, Frio Energy and FTL utilized a document called the "Frio Energy Partners Funding Timeline" which set forth timeline projections for the various tasks required in connection with the parties' pursuit of the acquisition of a property. Dkt. No. 84-8; Dkt. No. 90 ¶ 25; Dkt. No. 84-9 at 55:15–18. The timeline anticipated that the parties would determine required and desired partners during the week of August 30, 2021, that terms would be finalized with partners during the week of November 15, 2021, and that arrangements with "Capital Partners" and "Insurance Partners" would be finalized in December 2021 and January 2022. Dkt. No. 84-8; Dkt. No. 90 ¶ 25.

On October 6, 2021, within that timeline, Davis raised with Giarrusso the prospect of FTL preparing a letter "that could be used to show potential sellers [of oil and gas properties] so that they are assured we are real buyers of their assets." Dkt. No. 84-10 at 0639; Dkt. No. 93-7. Davis' email proposed several items he "believe[d] should be included to make the most impact." Dkt. No. 93-7. Those items included mentioning the commitment size, *id.* ("might be best to say $150 Mm with the potential increase to $XXX"), a paragraph about FTL's background, *id.*, and "clarif[ication] that FTL is not actively fundraising while negotiations are happening," *id.* Davis suggested that FTL could "provide context that [the] partnership is moving forward while logistics

of forming it are in process but that LP's are ready to move once completed or something similar"
because companies "are very weary of money being raised because some PE firms have said they
had funds and they didn't." *Id.*

Giarrusso sent Davis a draft letter for his review on October 18, 2021. Dkt. No. 93-8. The
draft letter stated in part:

> FTL has partnered with Frio Energy for the acquisition of non-operated working
> interests in oil-producing properties in the Permian Basin. Our initial commitment
> is for $150 million in the first phase, though we anticipate taking that to a second
> phase of over $300 million in the next 12 months.

*Id.* at 0735. After a round of edits from Davis, Dkt. Nos. 93-9, 93-10, the Letters of Intention were
finalized and on October 22, 2021, Giarrusso signed several of the Letters of Intention addressed
to potential third-party sellers, including Occidental Petroleum, Occidental Oil & Gas, Varde
Partners, EOG Resources, and One Energy Partners. Dkt. No. 93-11. The final letter retained the
language that FTL had "partnered" with Frio Energy and that its "initial commitment [wa]s for
$150 million in the first phase." *Id.* The final Letters of Intention also contained the same language
regarding the $150 million as the draft letter. *Id.* Over the next eight months, Plaintiff sent more
of the identical letters to potential sellers of oil and gas properties. Dkt. No. 93-1 at 247:12–21,
250:15–17; Dkt. No. 93-4 ¶ 18; Dkt. No. 93-12.[6]

Plaintiff states—and Defendant does not contest—that between November 19, 2021, and
February 25, 2022, Plaintiff sourced four potential deals, with values ranging from $36 million to
$108 million. Dkt. No. 93-4 ¶ 20. Defendant authorized Plaintiff to bid on two of the transactions,
but Plaintiff was outbid by competing purchasers. *Id.* ¶ 21; Dkt. Nos. 93-13, 93-14, 93-15, 93-16.

---

[6] Defendant contends that Frio Energy "forged multiple Letters of Intention sent to prospective
sellers and misled sellers." Dkt. No. 83 at 20–21 n.17; Dkt. Nos. 84-22, 84-23. However, Plaintiff
disputes that charge and submits supporting documents showing that FTL approved of packages
that included the Letters of Intention. Dkt. No. 90 ¶¶ 70–71; Dkt. Nos. 93-30, 93-31, 93-32.

At some point between February and April 2022, Plaintiff learned that FTL had not secured a debt facility for $150 million and that there would need to be a change to the capital structure of their venture. The parties dispute when Plaintiff came to that knowledge. Defendant relies on a February 7, 2022, email from Giarrusso to Davis and Ditto inviting them "to participate in the equity portion of the capital stack, ie as [limited partners]." Dkt. No. 84-14 at 2528. Defendant asserts that the email is evidence that Plaintiff knew by that date that FTL would no longer be able to raise a debt facility and that it would take investments in the form of equity. Davis responded to Giarrusso's email that "[w]e personally viewed that our $740,000 in payments to FTL would be considered quasi like equity investment (maybe misunderstood viewpoint)" and stated that "[w]ith that said, we are open to further discussion. What magnitude of investment were you thinking?" *Id.*

Plaintiff asserts that it did not know that FTL would no longer be able to raise a $150 million debt facility and that it was looking for equity investors until April 2022. Dkt. No. 90 ¶ 41; Dkt. No. 93-5 at 129:3–130:22, 132:5–6. Davis testified that he did not know how there could be an equity portion of a capital stack with a debt facility because "I don't know their inner-workings" and that until April 2022, he was not informed that the structure of the investment fund was changing. Dkt. No. 93-1 at 214:3–11.

In any event, by April 2022, Frio Energy and FTL still had not acquired any transaction or finalized their partnership agreement, and Davis told Giarrusso on April 13, 2022 that Plaintiff could not keep working for free. *Id.* at 214:24–216:4; Dkt. No. 93-4 ¶ 23. Davis testified that Giarrusso told him that "we had to change the structure to be . . . $40 million of equity, $110 million of debt because there were some changes in the market and this is the path we're going on forward." Dkt. No. 93-1 at 214:24–215:20; Dkt. No. 93-4 ¶ 25. Davis further testified

that Giarrusso told him that FTL had already raised the $40 million equity portion and would be closing half in May and other half in mid-June. Dkt. No. 93-1 at 214:24–215:20, 234:24–235:12, 302:11–303:8; Dkt. No. 93-4 ¶ 26; *see also* Dkt. No. 93-5 at 134:10–136:13 (Ditto testified that it was conveyed to him that Defendant had commitments for the $40 million.). Ditto testified that Frio Energy agreed to make a change from a debt facility to a fund. Dkt. No. 84-9 at 132:7–13.[7] At that time, Frio Energy demanded that its expenses be paid, and Giarrusso agreed to pay Frio Energy its costs and expenses including salaries. Dkt. No. 93-5 at 220:21–222:23; Dkt. No. 83 at 11.

Frio Energy continued to source investment opportunities. On May 12, 2022, Frio Energy sourced a potential deal valued at $240–$270 million, but FTL and Frio Energy walked away from the deal. Dkt. No. 93-4 ¶ 20. On May 19, 2022, Frio Energy sourced its sixth potential deal for FTL (the "Max Permian Transaction"). *Id.* ¶¶ 20, 28; Dkt. No. 93-18; Dkt. No. 90 ¶ 58.

Plaintiff claims that Davis repeatedly asked Giarrusso to confirm that FTL had raised the necessary funds to close the investment in the Max Permian Transaction. Dkt. No. 93-4 ¶ 29. At the time, FTL stated that it had the money to close the deal. Dkt. No. 93-1 at 275:1–276:11.[8] Each time Davis asked, Giarrusso confirmed that FTL had raised $40 million in equity from individual investors and limited partners. Dkt. No. 93-4 ¶ 29. Davis testified—and Defendant does not dispute—that, on May 24, 2022, Giarrusso told Davis that they had the money to close on the Max

---

[7] Plaintiff argues that that testimony is misleading and out of context, Dkt. No. 90 ¶ 44, because FTL announced the change as a settled matter and Davis and Ditto went along only because, as Davis testified, "[Ditto] and I felt that since we had put so much time and effort, and stuff we're kind of stuck, kind of stuck with FTL" Dkt. No. 93-1 at 214:24–215:20. Regardless, the undisputed evidence is that Plaintiff agreed to proceed with the relationship despite the change in capital structure.
[8] Plaintiff provided an excerpted version of the deposition transcript that did not include the text of the question to which Davis responded.

Permian Transaction.  Dkt. No. 93-1 at 276:3–11.  On May 25, 2022, FTL authorized Frio Energy to bid $9.2 million on the Max Permian Transaction and on June 2, 2022, it authorized Frio Energy to bid $10.5 million.  Dkt. No. 93-19; Dkt. No. 93-4 ¶ 30.  Frio Energy won the bidding process and, on June 15, 2022, the Max Permian Transaction sellers entered into a purchase and sale agreement with the parties.  Dkt. No. 93-4 ¶ 32; Dkt. No. 93-20.  The purchase and sale agreement contains a signature from Giarrusso in his capacity as "Manager, FTL Energy Assets LLC for FTL Energy Holdings LLC."  Dkt. No. 93-20 at ECF p. 30.[9]

The parties dispute when Plaintiff first came to understand that FTL had not raised the money to close the Max Permian Transaction.  Defendant argues that Plaintiff had remained aware of the state of fundraising ever since the parties' conversations about switching from a debt fund to include an equity component.  Dkt. No. 83 at 10.  Plaintiff argues that it did not learn that FTL had not raised the $10.5 million for the Max Permian Transaction until July 2022 when the parties failed to close the transaction.  Dkt. No. 88 at 8.

The purchase and sale agreement required FTL to deposit $525,000 within three days of execution.  Dkt. No. 93-20 at ECF p. 2.  More than a week later, on June 23, 2024, Giarrusso emailed Davis and Ditto (cc'ing Surles) an update on FTL's payment of the deposit, stating "I have been told that all hurdles are cleared, and we will receive one of the cash calls tomorrow.  I believe it is true.  That said, until it hits our account, and I verify the amount, and all of that, I cannot be 100% certain.  But I am cautiously optimistic."  Ditto testified that he understood the issue to be a delay in transferring existing funds through the banking system, rather than a funding issue.  Dkt.

---

[9] Defendant claims that Davis fraudulently inputted his own name and contact information on the purchase and sale agreement as the person to receive notice on behalf of the buyer.  Dkt. No. 90 ¶ 74; *compare* Dkt. No. 84-24 at 9022 *with* Dkt. No. 84-25 at 8964.  Plaintiff disputes that this insertion was fraudulent and claims that it was done at Giarrusso's direction.  Dkt. No. 90 ¶¶ 74–75; Dkt. No. 93-4 ¶ 33.

No. 84-9 at 195:18–197:15.  On June 24, 2022, Davis asked Giarrusso if the deposit would be funded that day.  Dkt. No. 84-15 at 8011.  Giarrusso responded "I have not seen the wires hit.  Very frustrating."  *Id.*  On June 26, 2022, Giarrusso advised Frio Energy that he had been told that the money for the deposit would be coming in but that there was no guarantee.  *Id.*; Dkt. No. 90 ¶ 49.  Ultimately, FTL funded the deposit late on June 27, 2022.  Dkt. No. 84-9 at 195:6–12; Dkt. No. 93-21.  Frio Energy conducted and completed due diligence on the Max Permian Transaction by the scheduled closing deadline of July 15, 2022.  Dkt. No. 93-22; Dkt. No. 93-4 ¶ 35; Dkt. No. 90 ¶ 60.

Davis testified—and Defendant does not dispute—that around July 15, 2022, Giarrusso informed Davis that FTL did not have the funds necessary to close the Max Permian Transaction.  Dkt. No. 93-4 ¶ 36; Dkt. No. 93-1 at 280:3–13.  Frio Energy negotiated an extension of the closing deadline, but FTL could not commit to obtaining the remaining funds within any new timeframe.  Dkt. No. 93-23; Dkt. No. 93-4 ¶ 37; Dkt. No. 93-1 at 280:3–21.  Ultimately, the Max Permian Transaction did not close, and the deposit was forfeited.  Dkt. No. 93-23; Dkt. No. 93-1 at 280:3–21.  Dkt. No. 93-1 at 281:9–14.

Davis avers that on or about July 15, 2022, he "once more informed FTL that Frio Energy could not continue to work without compensation and demanded that FTL pay Frio Energy for its labor from January to July 2022 and for costs incurred in connection with the failed Max Permian Transaction."  Dkt. No. 93-4 ¶ 39.  He avers that "FTL agreed to pay Frio Energy's out-of-pocket costs, which totaled $84,110, immediately, and promised that it would soon reimburse Frio Energy's labor costs, which totaled approximately $466,667, in the near future."  *Id.* ¶ 41.  However, according to Davis, FTL has paid Frio Energy only $59,199 for Frio Energy's out-of-pocket costs to date.  *Id.* ¶ 42.  Defendant does not dispute that, to date, FTL has not returned the

Structuring Deposit to Frio Energy or compensated Frio Energy for its labor and expenses beyond the $59,199.

## PROCEDURAL HISTORY

Plaintiff initiated this case by complaint filed on November 16, 2022. Dkt. No. 1. Plaintiff asserted claims for quantum meruit, unjust enrichment, promissory estoppel, and negligent misrepresentation.

On June 27, 2023, the Court issued an Opinion and Order granting in part and denying in part Defendant's motion to dismiss the complaint. *See Frio Energy Partners, LLC v. Fin. Tech. Leverage, LLC*, 680 F. Supp. 3d 322 (S.D.N.Y. 2023). The Court determined that Plaintiff failed to state a claim for relief as to (1) its promissory estoppel claim based on the Structuring Deposit, *id.* at 343; (2) its promissory estoppel claim based on post-Term Sheet promises that it had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022, *id.* at 344; (3) its negligent misrepresentation claim that Defendant represented on or about October 22, 2021, that it "had secured or would secure the minimum requisite $150 million of capital to invest through the Investment Fund by January 2022," *id.* at 347 (citing Dkt. No. 1 ¶¶ 28–30); and (4) its negligent misrepresentation claim that on or about July 15, 2022, FTL agreed to immediately cover Plaintiff's out-of-pocket costs and "promised that it would reimburse Frio Energy Partners' labor costs in the near future," *id.* at 351–52. The Court additionally held that Plaintiff had abandoned its claim for negligent misrepresentation based on pre-Term Sheet misrepresentations and misrepresentations in the Term Sheet and therefore dismissed that claim as well. *Id.* at 346–47.

The Court sustained Plaintiff's claims for unjust enrichment and quantum meruit, concluding that, at the motion to dismiss stage, a claim in quasi-contract should be dismissed "where a provision in a valid contract between the parties clearly covers the dispute between the

parties." *Id.* at 339.  However, where the Court cannot determine whether the contract is valid or whether it covers the dispute, then dismissal on the pleadings is not appropriate.  *See id.* at 339–40.  Applying that standard, the Court found that the enforceable provisions of the Term Sheet did not clearly cover the dispute over payment of labor costs and expenses so as to foreclose an action in quasi-contract.  *Id.* at 340–42.  The Court also found that "[t]he Term Sheet does not contain a binding provision addressing whether the Structuring Deposit will be returned to Plaintiff if Defendant fails to raise the $150 million for the Investment Fund and there is no close."  *Id.* at 341.

The Court additionally sustained the complaint's allegations of promissory estoppel based on Defendant's alleged promise that it would reimburse Plaintiff's expenses.  *Id.* at 344–45.  It dismissed Plaintiff's claims for promissory estoppel based on the allegations that Defendant promised that (1) it either already had or would be able to secure $150 million in investment capital; (2) that it would execute a formal partnership agreement with Plaintiff soon after signing the Term Sheet; or (3) that it would fund the purchase of the Max Permian Transaction for $10.5 million.  *Id.* at 342–44.

The Court also sustained Plaintiff's claims of negligent misrepresentation but only to the extent that Plaintiff alleged that on or about October 22, 2021, Defendant represented through the Letters of Intention that Defendant had an initial commitment of $150 million in capital to fund purchases of non-operating working interests in oil and gas producing properties in the Permian Basin and alleged that Defendant represented on or about May 24, 2022 that it had raised the requisite capital to fund the Permian Basin Transaction.  *Id.* at 347–51.  It dismissed Plaintiff's claims of negligent misrepresentation based upon Defendant's alleged representations (1) that it

would execute a formal partnership agreement with Plaintiff soon after signing the Term Sheet and (2) that it would pay Plaintiff for its services and labor incurred on its behalf.  *Id.* at 345–52.

Defendant filed the instant motion for summary judgment on June 14, 2024, along with a Local Rule 56.1 statement and a memorandum of law and declaration in support of the motion. Dkt. Nos. 82–85.  On July 19, 2024, Plaintiff filed a memorandum of law in opposition to the motion for summary judgment, a supporting affidavit, and a response to Defendant's Local Rule 56.1 Statement.  Dkt. Nos. 88–90.  Defendant filed a reply memorandum of law in further support of the motion for summary judgment on August 7, 2024.  Pursuant to the Court's order, Dkt. No. 92, Plaintiff filed a corrected affidavit in support of its opposition to summary judgment on September 26, 2024, Dkt. No. 93.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). To defeat a motion for summary judgment, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). "Mere conjecture or surmise by the nonmovant in support of his or her case is inadequate." *Am. Home Assurance Co. v. Jamaica*, 418 F. Supp. 2d 537, 546 (S.D.N.Y. 2006).

Local Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York prescribes the manner and method in which a party is to present undisputed issues of fact to the Court. The moving party must annex to its notice of motion "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The party opposing the motion for summary judgment is required to "include a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate,

short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Rule 56.1(b).[10] The statements "must be followed by citation to evidence which would be admissible and set forth as required by Fed. R. Civ. P. 56(c)." Local Rule 56.1(d). The consequences of failure to follow these rules can be severe. "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Rule 56.1(c).

Thus, a Local Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). If portions of a Local Rule 56.1 counterstatement cite to no admissible evidence in support of its denials, the Court is instructed to disregard those portions and deem the factual statements in the original Local Rule 56.1 statements admitted. *See, e.g.*, *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (holding that denials that are not supported by citations to admissible record evidence are to be disregarded). When the non-moving party in certain instances fails to cite to any record evidence for its denials, the Court accepts the moving party's characterization of those facts in its Local Rule 56.1 statement as undisputed. *See Colton v. N.Y. Div. of State Pol.*, 2017 WL 5508911, at *2 (N.D.N.Y. Feb. 8, 2017) ("The failure to properly controvert a supported statement of fact by pointing to admissible evidence contravening the movant's evidence results in the movant's statement being deemed admitted."); *Knight v. N.Y.C.H.A.*, 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007) ("Pursuant to Local Civil

---

[10] Local Rule 56.1 was amended effective July 1, 2024, after Defendant submitted its Local Rule 56.1 Statement but before Plaintiff submitted its response. Dkt. Nos. 85, 90. The wording of Local Rule 56.1 set forth here is the current wording.

Rule 56.1 Defendant's statements are deemed to be admitted where Plaintiff has failed to specifically controvert them with citations to the record.").

## DISCUSSION

Defendant argues that the Court lacks personal jurisdiction over it. Dkt. No. 83 at 16–17; Dkt. No. 91 at 5–7. Defendant also argues that Plaintiff's claims for unjust enrichment and quantum meruit fail because Plaintiff did not reasonably expect the Structuring Deposit would be returned or that Plaintiff's expenses would be reimbursed under present circumstances. Dkt. No. 83 at 18–20; Dkt. No. 91 at 7–9. Defendant argues that Plaintiff's claim for unjust enrichment additionally fails because Defendant received no direct benefit. Dkt. No. 83 at 20. Defendant further argues that Plaintiff's quasi-contract claims and promissory estoppel claim fail because the Term Sheet governs the dispute. *Id.* at 12–15. Defendant finally argues that Plaintiff's negligent misrepresentation claims fail because Plaintiff cannot show justifiable reliance or that there was a special relationship between Plaintiff and Defendant at the time of the purported misrepresentations.

## I.    Personal Jurisdiction

Defendant argues that, as a threshold matter, it is not subject to the Court's personal jurisdiction. Dkt. No. 83 at 16–17; Dkt. No. 91 at 5–7. Defendant argues that the "only basis for personal jurisdiction over FTL in New York is the Jurisdiction clause of the Term Sheet" and that "the Jurisdiction clause can only be interpreted to include breach of contract claims and cannot be interpreted to include 'non-contractual obligations arising out of or in connection with this term sheet' such as the claims asserted by Plaintiff." Dkt. No. 91 at 5. Defendant's personal jurisdiction argument is waived.

"[P]ersonal jurisdiction is a *personal* defense that may be waived or forfeited." *Mallory v. Norfolk S. Railway Co.*, 600 U.S. 122, 144 (2023) (plurality opinion). "As a general matter, a

defense under Rule 12(b)(2) is waived if it is not included in a preliminary motion under Rule 12 as required by Rule 12(g)." *Barter House, Inc. v. Infinity Spirits, LLC*, 2019 WL 3554584, at *19 (S.D.N.Y. Aug. 5, 2019) (quoting *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 1499185, at *5 (S.D.N.Y. Mar. 31, 2015)). Rule 12(g) provides that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). "Taken together, Rules 12(g) and 12(h) provide that a party waives its Rule 12(b)(2) defense if it previously made a Rule 12(b) motion, the Rule 12(b)(2) defense was available to the moving party at that time, and the moving party omitted that defense from its motion." *Barter House*, 2019 WL 3554584, at *19 (quoting *Laydon*, 2015 WL 1499185, at *5).

Plaintiff's complaint contains four counts, each of which assert non-contractual obligations in connection with the Term Sheet: quantum meruit, unjust enrichment, promissory estoppel, and negligent misrepresentation. Dkt. No. 1 at § V. None of the counts assert claims for breach of contract. Defendant moved to dismiss the complaint for failure to state a claim for relief under Rule 12(b)(6). Dkt. No. 17. It did not raise in its motion lack of personal jurisdiction under Rule 12(b)(1). It therefore waived its defense based on lack of personal jurisdiction.

Defendant argues that the jurisdiction defense was unavailable at the time it made its Rule 12(b)(6) motion. Dkt. No. 91 at 6–7. According to Defendant, "[i]t was not until FTL moved to dismiss on the basis that Plaintiff's claims were within the scope of the Term Sheet that Plaintiff changed course and took the position that its claims arose outside of the scope of the Term Sheet and that 'there is no binding, express contract between the parties that governs this dispute.'" *Id.* at 6 (quoting Dkt. No. 24 at 3–5). But that position is plainly mistaken. Plaintiff did not "change course" in its opposition to the motion to dismiss. From the beginning, Plaintiff never claimed

that the dispute between the parties was wholly governed by the Term Sheet; that is why it brought its claims in quasi-contract. Plaintiff alleged that the Term Sheet provided personal jurisdiction, Dkt. No. 1 ¶ 7, not that Plaintiff is entitled to recoupment of its expenses or of the Structuring Deposit based on the contract. To the contrary, it was Defendant who for the first time raised the point that the claims Plaintiff asserted sounded in contract. Dkt. No. 18 at 5–8.

Defendant could have made the exact same argument in its motion to dismiss the complaint that it makes now. *E.g.*, *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 216 (S.D.N.Y. 2014) (noting that a defendant may state arguments in the alternative on a motion to dismiss). Defendant does not argue that any law or fact changed subsequent to Defendant's motion to dismiss that obviated the personal jurisdiction that had previously existed. *Cf.*, *Gucci Am., Inc. v. Li*, 768 F.3d 122 (2d Cir. 2014) (because the United States Supreme Court overruled prior controlling Second Circuit precedent providing for jurisdiction, the appellant had not waived its personal jurisdiction defense by failing to bring the defense prior to the Supreme Court's opinion).

Summary judgment is therefore denied as to Defendant's personal jurisdiction defense.

## II.    Quantum Meruit and Unjust Enrichment

Defendant argues that the Court should grant it summary judgment as to Plaintiff's quasi-contract claims because (1) the Term Sheet is a valid contract that controls the disputed payments; (2) no reasonable jury could find that Plaintiff reasonably expected that the Structuring Deposit would be returned or that Plaintiff's expenses would be reimbursed if no transaction closed; and/or (3) based on the evidence not subject to genuine dispute, Defendant did not receive any direct benefit. Dkt. No. 83 at 16–20; Dkt. No. 91 at 5–9.

A quasi-contract "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Bradkin v. Leverton*, 257 N.E.2d 643, 645

(N.Y. 1970).  As the Court previously noted, the law surrounding quasi-contract claims looks to the "reasonable expectations of the parties." *Frio Energy*, 680 F. Supp. 3d at 338.

To recover in quantum meruit under New York law, a claimant must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000) (quoting *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2d Cir.1994)).  The expectation of compensation must be reasonable.  *See Argo Marine Sys., Inc. v. Camar Corp.*, 755 F.2d 1006, 1011 (2d Cir. 1985) (affirming dismissal of quasi-contract claims where plaintiff "did not have expressly or by implication, any reasonable expectancy flowing from any act or agreement of [defendant], to receive compensation"); *Abcon Assocs., Inc. v. Haas & Najarian*, 694 F. App'x 42, 44 (2d Cir. 2017) (summary order) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (Sotomayor, J.)).  Plaintiffs claiming unjust enrichment similarly must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006)).

A valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for services rendered pertaining to the same subject matter. *See Frio Energy*, 680 F. Supp. 3d at 338–39 (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987); *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 414 (S.D.N.Y. 2011); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009); 30 Williston on Contracts § 77:124 (4th ed. 2023); Restatement (Third) of Restitution

and Unjust Enrichment § 2 (2011)).  "[W]here there is a contract that expressly outlines the parties'
own definition of their respective obligations, then courts are loath, due to considerations of 'both
justice and efficiency,' to override those obligations in favor of 'obligations that the law would
impose in the absence of agreement.'"  *Frio Energy*, 680 F. Supp. 3d at 340 (quoting Restatement
(Third) of Restitution and Unjust Enrichment § 2).  "However, where the parties have entered into
a contract that does not address the specific question at issue in the parties' dispute, it does not
help minimize or eliminate the 'fundamental difficulty of valuation' to hold that the contract
precludes any claim that the dispute is governed by quasi-contractual relations between the
parties."  *Id.*  Framed in the language of the law of quasi-contract, a person who is party to an
agreement covering a service can have no reasonable expectation of compensation beyond what
the contract provides and, if the contract indicates the person is to receive no compensation, can
have no expectation of receiving compensation.

The threshold inquiry is thus whether the Term Sheet is a valid and enforceable written
contract that "covers the scope of the dispute."  *In re Coudert Bros.*, 487 B.R. 375, 396 (S.D.N.Y.
2013); *accord Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d
573, 587 (2d Cir. 2006) (a quasi-contract claim is inherently one that "'the law creates *in the
absence of any agreement*'" (quoting *Goldman v. Metropolitan Life Ins. Co.*, 841 N.E.2d 742 (N.Y.
2005))).[11]

---

[11] The standard has been occasionally stated as whether the contract "clearly" covers the dispute
between the parties, and that is the locution that the Court adopted at the motion to dismiss stage.
*See Frio Energy*, 680 F. Supp. 3d at 338.  Notwithstanding some loose language in the case law,
however, the ultimate question probably is best understood to be whether a valid and enforceable
contract covers the dispute.  Where a valid and enforceable contract reflects a meeting of the minds
that the plaintiff is entitled to consideration for the benefit it provided to the defendant, the plaintiff
is entitled to contract damages and not quasi-contract damages even if that meeting of the minds
is not apparent from the face of the agreement but must be demonstrated by parol evidence.  It
would be irrelevant whether plaintiff's entitlement to contract damages was "clear" or simply just

A determination that the contract does not cover Plaintiff's claim, however, does not end the inquiry. The relevant question is the plaintiff's reasonable expectations and whether equity and good conscience or principles of quantum meruit require that the plaintiff be paid. Those expectations can be informed by the terms of a binding as well as a non-binding agreement and the negotiations that led up to it. In some circumstances, the discussions among the parties as reflected in their writings can give rise to an expectation of compensation or may evidence that such expectation arose at an earlier date. *See Learning Annex Holdings, LLC v. Rich Glob., LLC*, 860 F. Supp. 2d 237, 244 (S.D.N.Y. 2012) ("[S]ubsequent interactions between the parties could support a reasonable expectation of compensation[;] [s]imply put, the fact that [the parties] had

---

established by the preponderance of the evidence. There is no double recovery. *See Sharbat v. Iovance Biotherapeutics, Inc.*, 2023 WL 7042563, at *5 (S.D.N.Y. Oct. 26, 2023) ("[C]ourts will not allow plaintiffs a double recovery for the same injuries based on contract and quasi-contract theories."); *Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *12 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.) ("Plaintiffs can ultimately recover on only one of their two claims for breach of contract and unjust enrichment." (quoting *Next Commc'ns, Inc. v. Viber Media, Inc.*, 2016 WL 1275659, at *8 (S.D.N.Y. Mar. 30, 2016) (Sullivan, J.))). It is appropriate to ask at the motion to dismiss stage whether the contract "clearly" covers the dispute because, at that stage as opposed to at the summary judgment or trial stages, the question is only whether the plaintiff has stated a plausible claim in quasi-contract. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (the complaint's factual allegations need only "raise a reasonable expectation that discovery will reveal evidence of [the underlying claim]"); *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 194 (S.D.N.Y. 2018) (concluding that dismissal of unjust enrichment claims would be "premature" at the motion to dismiss stage); *Union Bank, N.A. v. CBS Corp.*, 2009 WL 1675087, at *8 (S.D.N.Y. June 10, 2009) (holding that it is not appropriate for the court to rule "at the inception of this case and as a matter of law—that the parties' agreements govern the instant dispute"). A plaintiff at that stage can plead in the alternative, either that the contract covers the dispute or that, if it does not, it is entitled to recover in quasi-contract. *See Caro Cap., LLC v. Koch*, 2021 WL 2075481, at *1 (S.D.N.Y. May 24, 2021) (Although "the existence of an enforceable contract governing a particular subject matter 'ordinarily precludes recovery in quasi contract for events arising out of the same subject matter,'" in cases "[w]here 'there is a bona fide dispute concerning . . . whether the contract covers the dispute in issue,' the quasi-contract claim may be pled in the alternative." (quoting *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d Cir. 1996); *Nahabedian v. Intercloud Sys., Inc.*, 2016 WL 155084, at *4 (S.D.N.Y. Jan. 12, 2016))); *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 395 (S.D.N.Y. 2022) (same), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022), *and aff'd sub nom. In re Wade Park Land Holdings, LLC*, 2024 WL 3024648 (2d Cir. June 17, 2024).

not yet entered into a legally binding contract, and did not intend for the [nonbinding memorandum of understanding] to have legal effect, does not preclude [plaintiff] from having a reasonable expectation of compensation for work performed after communications suggesting a contrary understanding."), *aff'd sub nom. Learning Annex Holdings, LLC v. Cashflow Techs., Inc.*, 652 F. App'x 67 (2d Cir. 2016).  In other circumstances, negotiated but ultimately foregone terms may indicate the plaintiff's awareness that its provision of services were understood to be gratuitous. *See Quadrant Structured Prod. Co. v. Vertin*, 16 N.E.3d 1165, 1165 (N.Y. 2014) ("[I]f parties to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission."). Moreover, a plaintiff may rely on evidence of communications post-dating the relevant time as evidence of the parties' expectations at the relevant time.  *See Learning Annex*, 860 F. Supp. 2d at 244; *Vioni v. Providence Inv. Mgmt., L.L.C.*, 648 F. App'x 114, 117 (2d Cir. 2016) (summary order) (rejecting defendant's argument that "emails postdating the introduction cannot serve as evidence of the parties' expectations at the time of the introduction" (citing *John Anthony Rubino & Co. v. Swartz*, 923 N.Y.S.2d 492, 492 (1st Dep't 2011); *Cap. Heat, Inc. v. Buchheit*, 848 N.Y.S.2d 481, 483 (4th Dep't 2007))).

Furthermore, a party's understanding is not necessarily static.  For example, a party's understanding at the time of a memorandum of understanding that it will not receive compensation for its services "does not preclude [it] form having a reasonable expectation of compensation for work performed after communications suggesting a contrary understanding." *Learning Annex*, 860 F. Supp. 2d at 244.

A.    **Refund of the Structuring Deposit**

Defendant argues that, based on the negotiation of the Term Sheet and subsequent exchanges, Plaintiff could not have reasonably expected that its Structuring Deposit would be

refunded if there was no close.  Dkt. No. 83 at 15.  The Court agrees and Defendant is entitled to summary judgment.

The Court previously concluded that the Term Sheet on its face did not preclude Plaintiff from having a reasonable expectation that the Structuring Deposit would be returned if there was no close.  *Frio*, 680 F. Supp.3d at 341–42.  Because the Term Sheet has an enforceable provision with respect to the payment of the Structuring Deposit, but no binding provision with respect to the return of the Structuring Deposit, the Court concluded that there did "not appear to be any binding provision that govern[ed] when and, under what circumstances, the Structuring Deposit may be returned to Plaintiff."  *Id.* at 342.  The Term Sheet did not "clearly" preclude Plaintiff's claim and Plaintiff was entitled to discovery.  That ruling is law of the case and applies because FTL has not proffered "'cogent and compelling reasons'" for the Court to conclude otherwise.  *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 415 (S.D.N.Y. 2023) (citations omitted) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)).[12]

As stated, however, the determination that the contract does not cover Plaintiff's claim, does not end the inquiry.  The evidence that is not subject to genuine dispute establishes that Plaintiff had no reasonable expectation that the Structuring Deposit would be returned and that equity and good conscience do not require its return.  The Structuring Deposit was, in effect, an

---

[12] The First Department's recent holding in *Iberdrola Energy Projects v. MUFG Union Bank, N.A.*, 194 N.Y.S.3d 204 (1st Dep't 2023), does not demand a different conclusion.  In that case, the Appellate Division held that plaintiffs failed to state a claim for unjust enrichment based on the benefit that defendants enjoyed when a letter of credit was drawn upon because the contract spoke to the circumstances upon which the letter of credit could be drawn.  *Id.* at 208.  The fact that the defendants were not parties to the contract was irrelevant because a nonsignatory to a contract cannot be held liable when there is an express contract governing the same matter.  *Id.* at 411 (internal citations and quotations omitted).  In *Iberdrola*, there was an express contract and the court held that the contract was not ambiguous.  *Id.  Iberdrola* thus is consistent with the long-standing proposition of New York law that a claim of quasi-contract is precluded by contract only when a valid and enforceable contract unambiguously addresses the same subject.

investment in the joint venture between the parties. Plaintiff contributed its labor in identifying projects and the Structuring Deposit and Defendant contributed its labor in identifying funders. If each was successful in its endeavors and the Investment Fund was established, then both would benefit in the form of the equity participation they would enjoy in the ensuing projects. The Structuring Deposit would apply against the Structuring Fee. But each took the risk of loss if the venture was not successful.

The undisputed evidence regarding the negotiation of the Term Sheet as well as of the parties' understanding of the final Term Sheet, which was not available at the motion to dismiss stage, establishes that the parties viewed the Structuring Deposit as consideration for the equity interest Plaintiff was to receive in projects in which the fund invested if the parties were successful in raising a fund to invest in projects. As FTL puts it, Plaintiff's "payment of the Structuring Deposit was its bet on the success of the project." Dkt. No. 83 at 19. Thus, during the negotiation of the Term Sheet, the parties reflected their mutual understanding—as reflected in the July 13, 2021 draft's bracketed note—that the monies that Frio Energy agreed in advance to commit to the fund would be paid in exchange for a greater equity interest in the ensuing investments. Dkt. No. 84-4. Although such language did not make it into the final Term Sheet, Davis testified that he removed the language relating to the equity investment not because of any disagreement but rather because "that was just a comment they had in there[;] [i]t wasn't actually part of the term sheet." Dkt. No. 84-3 at 177:6–14; *see* Dkt. No. 84-1. The undisputed evidence also establishes that both parties continued to understand that the Structuring Deposit was Plaintiff's equity contribution. *See* Dkt. No. 90 ¶¶ 10, 43 ("Frio Energy had considered the Structuring Deposit an equity investment already."). Defendant contends that "Frio Energy understood that for each $20,000 per month contributed in connection with the Structuring Deposit it would receive a 10%

equity or profits interest equivalent if the project was successful." Dkt. No. 83 at 7 n.4 (citing Dkt. No. 84-3 at 175:23–176:2; Dkt. No. 84-4 at 0245). Davis testified to a similar understanding: "our portion of the structuring deposit is treated as equity . . . it's what allowed us to have 60 percent equity." Dkt. No. 84-3 at 145:1–22; *see also id.* at 175:15–176:2 (Davis further testified that the initial draft stated that "for every incremental $20,000 per month you get another 10 percent equity."). Ditto likewise testified that prior to the signing of the Term Sheet, it was discussed that the structuring deposit was Frio Energy's "skin in the game, our equity contribution." Dkt. No. 93-5 at 87:22–88:4, 95:10–4.[13] As it turns out, the Fund never was launched, and Plaintiff therefore lost its investment. But the failure of the Fund in the end cannot convert what was Plaintiff's equity investment in the venture into a deposit to which it was entitled to return, any more than the failure of a exchange-traded company can give rise to the right in a shareholder to the return of her investment.

Plaintiff has not identified evidence from which a jury could find that Defendant engaged in conduct or communications that would have given it a reasonable expectation that the funds it paid as a Structuring Deposit would be returned if a fund did not close. At the inception of the relationship between Plaintiff and Defendant, Plaintiff negotiated for, but did not receive, an

---

[13] Another provision of the Term Sheet reinforces this understanding of the Structuring Deposit as a form of investment rather than a more traditional (refundable) deposit. The nonbinding early termination provision states that if FTL Capital Ltd. chooses not to proceed with the transaction, then 80% of the Structuring Deposit will be refunded to Frio Energy. Dkt. No. 84-1 at 4. However, if Frio Energy chooses not to proceed, then 75% of the Structuring Fee (a fee equal to 1% of Investment Fund, less the amount of the Structuring Deposit paid by Frio Energy to date) would be considered fully earned with the unpaid balance to be payable immediately. *Id.* The Structuring Deposit is thus treated in part as Frio Energy's payment toward the Structuring Fee that FTL, as the Structuring Agent, is due for its services. In effect, that provision provides increased protections for FTL to compensate for FTL's labor and other expenditures made in pursuit of the joint venture if the contemplated transaction does not close due to either party's decision to terminate.

agreement that the Structuring Deposit would be treated as a real deposit, subject to return if the object of the agreement between the parties—the establishment of a fund—did not come to fruition. Frio Energy's July 26, 2021, draft of the Term Sheet requested that "if less than $100 Mm is raised then the $25k/month will be refunded by FTL to the company." Dkt. No. 84-2 at 1729. Davis' email attaching the redlined draft additionally noted that one of the "high level changes / discussion points" was, regarding the Structuring Deposit, the proposal that "if less than $100 Mm is raised then the $25k/month will be refunded by FTL to the company." *Id.* at 1723. But that request was refused. The final Term Sheet did not include any provision governing return of the Structuring Deposit to Plaintiff under any circumstances. Dkt. No. 84-1.

Plaintiff disputes Defendant's argument and points to evidence purportedly "showing that Frio Energy believed it would be reimbursed the Structuring Deposit if FTL did not meet its obligations." Dkt. No. 88 at 16–17. In support, however, Plaintiff points only to Ditto's testimony that "[t]he term sheet provided . . . if FTL did not meet its obligations, then we would get out capital back," Dkt. No. 93-5 at 118:3–119:14, and Davis' testimony that it was his understanding of the Term Sheet that "we were entitled to a refund of the structure payment" if "we were able to do our job, and source deals, and bring deals to the table[,] [b]ut FTL was not prepared to go forward," Dkt. No. 93-1 at 195:7–18. Any such understanding was unfounded. The Term Sheet did provide that, if FTL chose not to proceed with the transaction, that it would keep 20% of the Structuring Deposit but would refund 80%. Dkt. No. 84-1. But FTL did not choose not to proceed with the transactions, and the Term Sheet did *not* contemplate that Frio Energy would receive any refund, much less a full refund, if the debt facility could not be raised. In fact, such a provision had been proposed and rejected. Dkt. No. 84-1; Dkt. No. 84-2 at 1729. Indeed, when Davis was asked at his deposition if he could point to where it says that in the Term Sheet, he admitted that

"it doesn't address it."   Dkt. No. 93-1 at 195:19–22.   Davis and Ditto's testimony thus is insufficient to give rise to a genuine dispute of material fact that Frio Energy had a reasonable expectation of repayment if no deal closed.

Where a plaintiff's expectation of payment runs contrary to the parties' dealings and is based on a false reading of the contract, it cannot be said that the plaintiff had a "reasonable expectancy of receiving compensation." *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 513–14 (S.D.N.Y. 1997); *see Argo Marine Sys.*, 755 F.2d at 1011.   Whether or not Davis and Ditto *actually* expected refund of the Structuring Deposit in present circumstances is beside the point.   "The mere expectation of compensation by a party is not sufficient to merit recovery[;] [r]ather there must be a reasonable expectancy of receiving such compensation." *Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 437 (S.D.N.Y. 2001) (citation omitted).   Plaintiff does not identify any other exchange or fact that could have reasonably caused it to expect refund of the Structuring Deposit. Plaintiff therefore fails to identify a genuine dispute of fact as to its reasonable expectation as to refund of the Structuring Deposit, and summary judgment is granted to Defendant on this claim.

### B.    Compensation for Labor and Other Expenses

Defendant next argues that Plaintiff is not entitled to recovery in quantum meruit and unjust enrichment for the expenses and labor Plaintiff incurred in locating investment opportunities. Defendant relies on a negative implication from the Term Sheet that because the Term Sheet provided for the payment of expenses from the Fund after closing (to be borne by both sides), the parties understood that each side would bear its own expenses unless and until there was a closing. It also relies on other evidence to support the proposition that Plaintiff "understood that there was a possibility that a closing might never occur and that in that situation it would not receive reimbursement for its expenses."   Dkt. No. 83 at 18.   In Defendant's view, Plaintiff incurred the expenses gratuitously or in exchange for what both parties believed would be suitable rewards if a

fund closed and it located projects in which to invest.  The fact that a fund could not be closed and therefore that the parties did not have the monies to make investments does not, in Defendant's view, give rise to a right to have those expenses paid for by Defendant.

Plaintiff has failed to identify evidence giving rise to a genuine issue of fact that it is entitled to reimbursement of its expenses prior to April 2022.  Although the Term Sheet alone and in isolation would not defeat Plaintiff's claim for quantum meruit and unjust enrichment in the face of contrary evidence for reasons previously stated by the Court in its opinion on the motion to dismiss, *Frio Energy*, 680 F. Supp. 3d at 340–41, that document suggests that Plaintiff understood it would not be compensated from Defendant in the event that the debt facility were not created.  The binding provision of the Term Sheet concerning expenses contemplates that "[u]pon the Close," the expenses of both of the parties would be paid for out of the proceeds from the debt.  Dkt. No. 84-1.  Each of the parties would have its pre-closing expenses covered, but each of the parties would share to some extent in the cost of those expenses.  The Term Sheet contemplated that both Frio Energy and FTL would share in the profits generated by the Investment Fund by virtue of their equity interests, and therefore each would also share in the costs if the Investment Fund could not be invested but was used to cover pre-closing expenses. A negative implication can be drawn from the Term Sheet itself that the parties did not contemplate that if an Investment Fund was not raised, then FTL would have to absorb not only its own expenses but also those of Frio Energy.

The negotiating history of the Term Sheet tends to refute any notion that Frio Energy would have a reasonable expectation that its expenses would be paid by Defendant if the $150 million Investment Fund was not raised.  The original draft Term Sheet circulated by FTL did not provide that Frio Energy's expenses would be covered in any circumstances—even if the Fund had been

raised.  It provided that FTL, but not Frio Energy, would have its reasonable legal, accounting, travel, and other professional service fees, reimbursed up to $500,000, by the company that would be formed by FTL and Frio Energy after the Fund was raised, but it did not provide for any reimbursement of Plaintiff's expenses.  Dkt. No. 84-4.  In the negotiations that led to the final Term Sheet, Frio Energy succeeded in forging an agreement that its expenses as well as those of FTL would be reimbursed by their shared venture upon a successful close, but there is no evidence that Frio Energy asked for—much less received—any agreement other than that its expenses would be covered by the shared venture in the event of that close.  Tellingly, in response to FTL's request (through the initial draft term sheet) that its expenses be covered out of the debt facility, Davis raised that his "side will have legal expenses and other items that will need to be reimbursed *as well*," No. 84-6 at 1907 (emphasis added), but he did not suggest that his "side" would have a *greater* right to have its expenses paid than FTL would, which is what Frio Energy is claiming in this lawsuit.

Plaintiff's cited evidence does not show that Plaintiff reasonably believed, from the inception of the parties' business relationship, that Defendant would reimburse it for labor and other expenses.  Instead, the undisputed evidence shows that prior to April 2022, Plaintiff did not have reason to believe that in the event the Fund did not close, it would still be compensated for its expenses and labor from Defendant rather than from the amount of monies that were raised.

It is not as if the topic was unexplored.  Davis' email also stated that one "high level change[] / discussion point[]" was "need to understand / structure how G&A is handled pre-acquisitions and post acquisitions" and that "[a]ny suggestions would be greatly appreciated." Dkt. No. 84-2 at 1723.  But no provision made its way into any draft of the term sheet that would have

suggested that, in the absence of a close, Plaintiff but not Defendant would have its expenses covered.

The testimony and statements of Plaintiff's officers themselves reflects that they understood that they had no unconditional right to reimbursement of their expenses prior to a close. Ditto testified at deposition that he understood that until there was a close, meaning the final purchase of a property, Frio Energy could not recover its expenses. Dkt. No. 84-9 at 101:5–14, 103:18–104:10.[14]  As late as April 29, 2022, Davis emailed Giarrusso asking "we have been assuming that we accrue our expense and salaries as of January 1, 2022 and that we would be reimbursed this upon the formation of the company.  Is that what you were thinking as well?"  Dkt. No. 84-16.  The language of Davis' letter plainly reflects that Davis understood that Frio Energy would be reimbursed only after "the company" was formed—*i.e.*, once the parties signed a master services agreement and created a joint business.  *See Vioni*, 648 F. App'x at 117 (holding that later communications may shed light on the parties' expectations at an earlier time); *see also John Anthony Rubino*, 923 N.Y.S.2d at 492; *Cap. Heat*, 848 N.Y.S.2d at 483.  Even in his declaration in opposition to the motion for summary judgment, Davis stops short of the claim that he and Ditto believed that Frio Energy would be reimbursed for its expenses in the absence of a close.  He states: "for months Dr. Giarrusso and Mr. Surles told me and Mr. Ditto that FTL would pay for the reasonable value of the services performed by Frio Energy upon closing.  It was not a matter of *if* the parties closed on a deal, but *when*, as FTL had represented multiple times that it had raised

---

[14] There is conflicting testimony regarding what a close meant.  Davis testified in his capacity as Plaintiff's corporate representative that Plaintiff understood close to mean "[w]hen final documents are executed and initial funds are transferred . . . for the underlying deal."  Dkt. No. 93-28 at 56:12–5.  Davis later testified in his fact deposition that he understood that the term sheet defined close as "forming the JB with an MSA."  Dkt. No. 93-1 at 227:22–228:13.  The point, however, is that there was not even a belief on the part of Plaintiff, much less a reasonable one, that Frio Energy had an unconditional right to reimbursement of its expenses.

the $150 million in capital for the Investment Fund."  Dkt. No. 93-4 ¶ 22.  In other words, the reimbursement of expenses was tied to the closing of a deal. Plaintiff offers no reason why Frio Energy and FTL would even have had the conversation that Frio Energy would be paid for its services "upon closing," if, as Frio Energy would now have it, Frio Energy was entitled to be paid for its services even if there were not a closing.

Plaintiff's evidence is insufficient to raise a genuine dispute of material fact as to its expectations of compensation prior to April 2022.  It relies on testimony given by Davis in deposition that he formed the belief that Plaintiff "would get paid from a debt fund before close on an investment" because the Term Sheet states that after close, budgeted general and administrative expenses associated with pre-deal expenses would be reimbursed and close referred to forming "the JB with an MSA."  Dkt. No. 93-1 at 227:22–228:13.[15]  Plaintiff also points to the allegations in the complaint and Davis' affidavit, which state that during the parties' conference calls in July 2021, "Giarrusso on behalf of FTL represented that . . . FTL would fully compensate Frio Energy Partners for its general and administrative . . . costs and any other reasonable out-of-pocket expenses incurred in sourcing investment opportunities and performing work for FTL from January 2022 forward."  Dkt. No. 1 ¶ 17(e); Dkt. No. 93-4 ¶ 7(f).  None of that evidence, even viewed collectively, gives rise to a triable question of fact.

It is black letter law that Plaintiff cannot defeat summary judgment "by relying on the allegations in [its] pleading, or on conclusory statements."  *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 215 (S.D.N.Y. 2022) (quoting *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)).  That Plaintiff may have alleged that it had a reasonable expectation it

---

[15] Although neither party defines these terms, for the purposes of this motion, the Court assumes "JB" to mean "joint business" and "MSA" to mean "master services agreement."

would be reimbursed in the absence of a close cannot create a genuine issue of fact if discovery did not yield evidence supporting that allegation. Moreover, accepting Davis' affidavit as true for purposes of this motion, Giarrusso may have represented in the summer of 2021, prior to the execution of the Term Sheet, that FTL would compensate Frio Energy for its expenses incurred in sourcing investment opportunities, Dkt. No. 93-4 ¶ 7(f), but Davis did not testify that any such understanding persisted after the Term Sheet was executed when Frio Energy began to actually incur expenses. Finally, to the extent that Plaintiff's expectations of repayment were derived from the Term Sheet's binding provisions regarding expenses, not only are those expectations refuted by the language of the Term Sheet itself, but if they were not, Plaintiff's claim would sound in contract and not in quasi-contract. *See Clark-Fitzpatrick*, 516 N.E.2d at 193; *Navillus Tile*, 920 N.Y.S.2d at 787.

Plaintiff does, however, advance some evidence that the parties reached a new expectation of reimbursement in April 2022. *See Learning Annex*, 860 F. Supp. 2d at 244; *Hussain v. Pakistan Int'l Airlines Corp.*, 2012 WL 5289541, at *4 (E.D.N.Y. Oct. 23, 2012) (denying summary judgment on quantum meruit and unjust enrichment where the parties "dispute the validity of [plaintiff's] expectation of additional compensation"); *Exportaciones Del Futuro S.A. de C.V. v. Iconix Brand Grp. Inc.*, 636 F. Supp. 2d 223, 233–34 (S.D.N.Y. 2009) (similar).

Although Plaintiff's evidence tends to refute the argument that Plaintiff reasonably expected that its expenses would be covered any time prior to April 13, 2022, the evidence does establish a triable issue with respect to the expenses incurred after that date. According to Ditto, in April of 2022, upon being informed that the investment fund would incorporate an equity component, Plaintiff "demanded that we get our expenses paid up and also our [general and administrative expenses] and salaries that we had agreed upon as far as the numbers." Dkt. No. 93-

5 at 220:13–222:23.  Davis' declaration states that conversation occurred on April 13, 2022, and

Defendant does not dispute that date.  Dkt. No. 93-4 ¶¶ 23–27; Dkt. No. 83 at 10–11; Dkt. No. 91

at 3.  Ditto testified that, after Plaintiff requested reimbursement of its expenses and salaries,

Defendant "agreed to reimburse us and requested that we get all of our itemized expense reports

and a full exhibit of our costs."  *Id.* at 222:18–23.[16]  He testified that based on "multiple

conversations with Glen Surles and Federick Giarrusso" he understood that any business-related

cost would be paid along with salaries.  *Id.* at 223:12–21.  That testimony is consistent with the

documentary evidence.  On May 10, 2022, Davis emailed Giarrusso a summary of salary and other

expenses totaling $395,733.93 for January through May of 2022.  Dkt. No. 93-33.  The next day

Plaintiff emailed an amended summary totaling $402,698.93.  *Id.*  Giarrusso responded "Thanks

Aaron!"  *Id.*  On July 6, 2022, Davis emailed Giarrusso a summary of salary and other expenses

totaling $548,660.08 as well as summarizing the expected closing costs for the Max Permian

Transaction.  Dkt. No. 93-34. It is also consistent with the fact that, as Davis avers, after the Max

Permian transaction fell through, FTL began partial payment of Frio Energy's expenses.  Dkt.

No. 93-4 ¶ 42; *see also id.* at ¶ 41 ("FTL agreed to pay Frio Energy's out-of-pocket costs . . .

immediately, and promised that it would reimburse Frio Energy's labor costs, . . . in the near future,

despite that the parties had not closed on a transaction.").  *See Brennan Beer Gorman/Architects,*

*LLP v. Cappelli Entes., Inc.*, 925 N.Y.S.2d 25, 27 (1st Dep't 2011) (denying summary judgment

on quantum meruit claim where "the record indicates that defendants acknowledged the need to

---

[16] Ditto's testimony on this point further suggests that there was no such expectation prior to April 2022.  *See id.* ("Q. So when did they actually agree to reimburse you for your expenses and . . . salaries?  A. It would have been after . . . they notified us of them changing the deal structure of . . . their funding.").

pay plaintiff at least some amount for its services" and "defendants asked plaintiff to prepare a summary of spending and payment status").

Plaintiff also has offered sufficient evidence, in support of its claim for unjust enrichment that Defendant "actually received a benefit," *Regnante v. Sec. & Exch. Offs.*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015), that was "specific and direct," *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (Sotomayor, J.). "[A] claimant is not entitled to recover in quantum meruit when services have been rendered with the expectation that a future business opportunity or contract—rather than direct compensation—will be forthcoming." *Foros Advisors LLC v. Digital Globe, Inc.*, 333 F. Supp. 3d 354, 365 (S.D.N.Y. 2018) (citing *Anderson v. Iceland Seafood Corp.*, 77 F.3d 480, 480 (5th Cir. 1996) (per curiam)). "Parties to a contract routinely provide services 'gratuitously in the hope that there would be a transaction and value would be returned.'" *Frio Energy*, 680 F. Supp. 3d at 341 n.5 (quoting *Ruby Has*, 565 F. Supp. 3d at 461); *see also Learning Annex*, 860 F. Supp. 2d at 243 ("[A] plaintiff does not reasonably expect compensation for efforts to bring to fruition a new business that does not materialize as the plaintiff had hoped." (citation omitted)). However, here, at least for the period after April 13, 2022, there is evidence from which a jury could find that Defendant received a direct and specific benefit from Plaintiff's continued sourcing efforts.

As of that date, FTL had already incurred efforts and expenses in attempting to raise monies for the parties' venture. It had an expectation that if each party did its job, and Frio Energy identified projects while FTL found funding, both would profit. But Frio Energy was threatening to end the venture and to cease locating opportunities if FTL did not pay its expenses. When Frio Energy continued to locate projects then, a jury could find that FTL received a direct and specific benefit. It may be that none of those projects came to fruition, because the monies were unable to

be raised.  But "a person may be liable in unjust enrichment even though the benefit received as a result of the unjust enrichment did not allow that person to turn a profit."  *U.S. E. Telecommc'ns., Inc. v. US W. Commc'ns Servs., Inc.*, 38 F.3d 1289, 1299 (2d Cir. 1994); *see also Farash v. Sykes Datatronics, Inc.*, 452 N.E.2d 1245, 1248 (N.Y. 1983) ("The plaintiff recovers the reasonable value of his performance whether or not the defendant in any economic sense benefitted from the performance.").

Summary judgment is therefore denied as to Plaintiff's quasi-contract claims surrounding reimbursement for its labor and other expenses incurred post-April 13, 2022, and is granted as to Plaintiff's quasi contract claims prior to that date.

## III.    Promissory Estoppel

"Under New York law, the elements of promissory estoppel are (i) a clear and unambiguous promise by the promisor; (ii) reasonable and foreseeable reliance by the promisee; and (iii) an injury to the promisee."  *Braun v. CMGI, Inc.*, 64 F. App'x 301, 304 (2d Cir. 2003) (citing *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir. 1984)).  As this Court previously noted, "promissory estoppel differs from quantum meruit and unjust enrichment in that it turns not on the nature of the benefit received by the defendant but upon the clarity and definitiveness of its promise and change in the plaintiff's position as a result of that promise."  *Frio Energy*, 680 F. Supp. 3d at 342 (citing *Drummond v. Akselrad*, 2023 WL 3173780, at *11 (S.D.N.Y. May 1, 2023)).

Where there is an enforceable written contract whose terms are inconsistent with the statements that form the basis of the claim for promissory estoppel, the promissory estoppel claim generally will not lie because "the claiming party could not have reasonably relied on those statements as a matter of law."  *Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, 2008 WL 650403, at *11 (S.D.N.Y. Mar. 7, 2008) (emphasis omitted); *see Bader v. Wells Fargo Home Mortg. Inc.*, 773

F. Supp. 2d 397, 415 (S.D.N.Y. 2011) ("When an enforceable contract does exist, the parties cannot assert a claim for promissory estoppel based on alleged promises that contradict the written contract." (citing *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 759 F.Supp. 1004, 1011 (S.D.N.Y. 1991))).

Plaintiff's complaint alleged that Defendant made four clear and unambiguous promises that FTL "(1) had either secured or was able to secure $150 million in investment capital; (2) would execute a formal partnership agreement with Frio Energy Partners soon after signing the Term Sheet; (3) would fund the purchase of an oil and gas acquisition opportunity valued at approximately $10.5 million which was sourced, researched, and negotiated by Frio Energy Partners; and (4) would pay Frio Energy Partners for it services and labor incurred on its behalf." Dkt. No. 1 ¶ 125.  In its Opinion and Order on the motion to dismiss, the Court held that the first three promises could not support a claim for promissory estoppel because the Term Sheet "render[s] any alleged statement by Defendant ambiguous and make[s] any reliance upon Defendant's earlier statements unreasonable as a matter of law." *Frio Energy*, 680 F. Supp. 3d at 343–44.  The Court however, sustained Plaintiff's claim for promissory estoppel based on the alleged promise that Defendant would be paid for its expenses and services.  *Id.* at 344–45.

Defendant now argues that it is entitled to summary judgment on Plaintiff's remaining promissory estoppel claim arising from FTL's alleged promises to pay Frio Energy's expenses. Dkt. No. 83 at 15 n.10; Dkt. No. 91 at 9 n.6.  Defendant argues that the Term Sheet "unambiguously does not provide for reimbursement of expenses unless there is a close," and "[i]f terms of an unambiguous contract are inconsistent with the statements that form the basis of the claim, the claiming party could not have reasonably relied on those statements as a matter of law." Dkt. No. 83 at 14–15 & n.10 (quoting *MBNA Am. Bank*, 2008 WL 650403, at *11).

Plaintiff is not entitled to recover through promissory estoppel any expenses prior to April 13, 2022. The only evidence it offers of a promise prior to April 13, 2022, is the conclusory claim by Davis that "Frio Energy never intended to work for free and always expected payment for its services and reimbursement of its expenses," and the factual assertion that "for months Dr. Giarrusso and Mr. Surles told me and Mr. Ditto that FTL would pay for the reasonable value of the services performed by Frio Energy upon closing." Dkt. No. 93-4 ¶ 22. Davis goes on to state that "[i]t was not a matter of *if* the parties closed on a deal, but *when,* as FTL had represented multiple times that it had raised the $150 million in capital for the Investment Fund" and that "[h]ad FRIO Energy known that FTL had not in fact raised the capital, then it would not have continued to work without payment." *Id.*

The evidence does not give rise to a genuine issue of material fact for the period before April 13, 2022. Even if Plaintiff did expect repayment at that time—a conclusion unsupported by the evidence, *see supra*—Plaintiff's unilateral expectation that it would have its expenses paid cannot, in the absence of a clear and unequivocal promise, give rise to a claim in promissory estoppel for those expenses. *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996) ("Because there is no clear and unambiguous promise, the promissory estoppel claim was properly dismissed" on summary judgment.) *Kavitz v. Int'l Bus. Machs., Corp.*, 458 F. App'x 18, 20 (2d Cir. 2012) (summary order) ("'Regardless of any previous course of dealing and any actions taken in reliance, without a clear and unambiguous promise there is no promissory estoppel.'" (quoting *U S W. Fin. Servs., Inc. v. Tollman*, 786 F. Supp. 333, 344 (S.D.N.Y. 1992))).

And the second set of assertions, regarding what Plaintiff was told by Giaurrusso and Surles, actually undermines rather than supports Plaintiff's claim. In Plaintiff's telling, the promise was *conditional*. If there was a closing, then Plaintiff's expenses would be reimbursed.

Plaintiff claims that it expected that there would be a closing because of statements made by Defendant allegedly regarding the capital that had been raised. But the Court has ruled that Plaintiff has no claim in promissory estoppel that Defendant promised that it had the committed funds to close the transaction. *Frio Energy*, 680 F. Supp. 3d at 343–44. It follows that the promise that Plaintiff's expenses would be paid if there were a closing is not actionable when there was no closing and Defendant never promised clearly and unequivocally that there would be a closing.

Plaintiff, however, is entitled to proceed on its claim for promissory estoppel based on the promise on April 13, 2022, that Defendant would reimburse Plaintiff for its expenses. The only argument that Defendant makes to forestall that claim is that the Term Sheet precludes a claim based on promissory estoppel for expenses. But this is precisely the argument that the Court rejected in its prior Opinion and Order. The Term Sheet was not an enforceable agreement in all respects. *See Frio Energy*, 680 F. Supp. 3d at 344–45. And even if Defendant did not promise through the Term Sheet in August 2021 that Plaintiff would be reimbursed for its expenses pre-closing, that would not foreclose Defendant from making a clear and unequivocal promise at a later date that Plaintiff's expenses would be paid or prevent Plaintiff from relying upon that representation in continuing to perform work locating projects. *See Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, 2004 WL 1886293, at *8 (S.D.N.Y. Aug. 24, 2004) (While a merger clause "may preclude Defendants[] from claiming they reasonably relied upon promises *prior* to the Loan Agreement, it does not preclude Defendants from claiming they reasonably relied upon promises made *after* the Loan Agreement."); *Washington v. Kellwood Co.*, 2009 WL 855652, at *9 (S.D.N.Y. Mar. 24, 2009) (similar).

## IV.    Negligent Misrepresentation

Two of Plaintiff's negligent misrepresentation claims survived the motion to dismiss: (1) that on or about October 22, 2021, Defendant represented through the Letters of Intention that

Defendant had an initial commitment of $150 million in capital available to fund purchases of non-operating working interests in oil and gas producing properties in the Permian Basin and (2) that on or about May 24, 2022, Defendant represented that it had raised the requisite capital to fund the Permian Basin Transaction. *Frio Energy*, 680 F. Supp. 3d at 347–51. Defendant argues that summary judgment should be granted on both. Dkt. No. 83 at 21–25.

Under New York law, to establish liability for negligent misrepresentation, a plaintiff must show that:

> (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.

*Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000); *see also Heard v. City of New York*, 623 N.E.2d 541, 545 (N.Y. 1993) (similar); *Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118, *amended*, 489 N.E.2d 249 (N.Y. 1985) (similar).

"For there to be an actionable claim, the defendant must be under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiff's reliance upon the information must be foreseeable." *Heard*, 623 N.E.2d at 545; *accord Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) ("[M]isstatements are actionable only if the defendant is under a duty to the plaintiff to exercise reasonable care in giving the information, and plaintiff['s] reliance upon the information [is] foreseeable." (citation omitted)). The requisite duty to speak with care arises when there is a special relationship of trust or confidence between the parties. *See Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 523, 539 (S.D.N.Y. 2007); *Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 811 (1st Dep't) ("[W]hile generally there is no liability for words negligently spoken, there is an exception when

the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller."). To determine whether the parties had a special relationship, courts look to factors including: "[1] whether the person making the representation held or appeared to hold unique or special expertise; [2] whether a special relationship of trust or confidence existed between the parties; and [3] whether the speaker was aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer*, 675 N.E.2d 450, 454 (N.Y. 1996); *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 584 (2d Cir. 2005) (similar); *Credit All.*, 483 N.E.2d at 118 (similar); Restatement (Second) of Torts § 552.

Finally, to satisfy the reliance element of a negligent misrepresentation claim, a plaintiff must prove both actual reliance and reasonable reliance. *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 505 (S.D.N.Y. 2018); *In re Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5518146, at *94 (S.D.N.Y. Sept. 14, 2020). In assessing the reasonableness of a plaintiff's reliance, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). To establish justifiable reliance, a plaintiff must prove both that he was "justified in believing the representation and that he was justified in acting upon it." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228 (S.D.N.Y. 2007) (citation omitted), *aff'd*, 354 F. App'x 496 (2d Cir. 2009).

A person is not justified in relying upon an obviously false representation or a representation whose falsity is known to him. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 278 (2d Cir. 1992) ("[A] party may not justifiably rely on obviously false

representations."), *abrogated on other grounds by Gerosa v. Savasta & Co., Inc.*, 329 F.3d 317 (2d Cir. 2003)); Restatement (Second) of Torts § 541 (1977) (Reliance upon a misrepresentation is not justified "if he knows that it is false or its falsity is obvious to him."); *see also* Prosser & Keeton on Torts § 108 (5th ed. 1984) (A plaintiff "may not put faith in representations which any such normal person would recognize at once as preposterous . . . or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth."); *Feder v. Bd. of Educ. of City of N.Y.*, 537 N.Y.S.2d 828, 829 (2d Dep't 1989) ("Clearly, [plaintiff] could not have relied on the defendant's alleged promises of aid to lull her into a false sense of security when it was evident that such aid was not forthcoming.").

## A.    Letters of Intention

Defendant is entitled to summary judgment on Plaintiff's claim that that the Letters of Intention Giarrusso sent Davis in October 2021 negligently misrepresented that FTL "had an initial commitment of $150 million in capital available to fund purchases of non-operating working interests in oil and gas producing properties in the Permian Basin." Dkt. No. 1 ¶¶ 33, 125–130. No reasonable jury could find that Plaintiff understood that letter to reflect that Defendant actually had $150 million in available capital or that Plaintiff's alleged reliance was reasonable.[17]

The Letters of Intention stated in relevant part:

FTL has partnered with Frio [Energy] for the acquisition of non-operated working interest in oil and gas producing properties located in the Permian Basin. Our initial commitment is for $150 million in the first phase, though we anticipate taking that to a second phase of over $300 million in the next 12 months.

---

[17] Defendant additionally argues that it is entitled to summary because (1) the Letters of Intention were ambiguous and vague; (2) Plaintiff was involved in drafting the Letters of Intention; and (3) because Plaintiff and Defendant did not have a special relationship. Dkt. No. 83 at 21–25. However, because the Court finds that Defendant is entitled to summary judgment based on Plaintiff's failure to show a genuine dispute of material fact as to its reasonable reliance, the Court need not reach those arguments.

Dkt. No. 93-11 at 0764–70.  According to Plaintiff, Defendant had not raised $150 million by that point.  *See* Dkt. No. 1 ¶ 30; Dkt. No. 93-4 ¶ 19.  That fact is undisputed.

No jury could find from the evidence proffered by Plaintiff that it reasonably understood that letter to convey that Defendant had raised $150 million in available capital by October 2021.

On June 22, 2021, Plaintiff sent Defendant a sample commitment letter.  Dkt. No. 84-11.  That letter was far more committal and specific than the one Defendant ultimately prepared.  It stated that the sender's company "holds funds and stocks" at certain named banks "with a minimum amount of $125MM–$150MM" and that "[t]he funds in the bank accounts are not restricted and may be used for permitted investments" such as "[t]he acquisition of US oil and gas production."  *Id.* at 0259.  The example letter further stated that "I have authority without limitations or further approvals to use those funds to invest in these assets."  *Id.*  Tellingly, the Letter of Intention did not state that Defendant held any funds.  Dkt. No. 93-11 at 0764–70.  It stated only that FTL had made a commitment for $150 million.  *Id.*  It did not state that FTL had $150 million or had been successful in raising $150 million in debt capital.  *Id.*

In fact, the undisputed factual evidence demonstrates that Frio Energy would have been well aware by October 2021 that FTL did not have $150 million in committed debt capital.  The Term Sheet was signed in August 2021.  During the negotiation of the Term Sheet in July of 2021, the parties discussed and repeatedly changed the terms on which the debt would be raised by FTL from prospective investors.  FTL's initial July 13 draft proposed a $100 million debt facility, that investors would be paid interest at a rate of 12% per annum on that portion of the debt that was called or drawn, and that all debt would be repaid within five years of the close.  Dkt. No. 84-4.  Frio Energy's July 19 draft increased the size of the proposed debt facility to $150 million, proposed that investors would be paid the lower rate of interest of 10% per annum, and required a

longer-term debt investment of six and a half years of the close.  It also proposed a three-year minimum repayment time frame that would penalize the venture for repaying the debt prior to three years.  Dkt. No. 84-6.  Frio Energy's July 26 draft retained the $150 million Investment Fund size and 10% interest rate, but proposed altering the debt repayment timeline back to be within five years of the close in addition to the three-year minimum repayment time frame.  Dkt. No. 84-2.  Indeed, the July 26 draft also proposed with respect to the Structuring Deposit, that "[i]f FTL is unable to raise a minimum of $100 Mm then the $25,000 shall be refunded to [Frio Energy]." *Id.*  The final Term Sheet omitted the provision concerning refund of the Structuring Deposit but adopted the July 26 proposals concerning the fund size, interest rate, and debt repayment timeline. Dkt. No. 84-1.  It would have been apparent to Frio Energy throughout those negotiations that no $150 million debt facility yet existed.  If FTL had raised $150 million in debt, then the terms concerning the interest to be paid to those investors would obviously have been agreed.  There would have been no occasion for Frio Energy to negotiate the terms under which FTL would be permitted to offer debt investments.  Certainly, if FTL had procured a $150 million debt facility in July and August 2021, Frio Energy would not have proposed that the Structuring Deposit would be returned in that case that FTL failed to raise the lower sum of $100 million.

No reasonable jury could find that Frio Energy reasonably believed FTL had successfully raised $150 million in debt in the limited time from the beginning of August 2021 to October 2021. The process diagram shared by the parties in late July during their negotiations contemplated a time period of three months (at a minimum), or through October 2021, for FTL to structure and underwrite the debt facility with a period of two to three weeks thereafter to finalize investments. Dkt. No. 84-7.  The process diagram stated that 4–6 weeks would be required to complete the "Assess" phase including "[v]erify[ing] partner appetites." *Id.* at 1722.  After that, 4–6 more weeks

would be required to complete due diligence, and then structuring and underwriting would take 2–4 months to complete including "[d]etermin[ing] required/desired partners," "[d]iscuss[ing] with partners," "[g]ather[ing] partner feedback," and "[a]dapt[ing] to partner requirements." *Id.*  The stage after that was also projected to take 2–4 weeks and would include "[f]inaliz[ing] terms," "[f]inaliz[ing] partners," "[c]raft[ing] legal documents" and "[s]et[ting] up bank accounts." *Id.*  In other words, it projected a date over five months out from the signing of the Term Sheet to finalize the partners for the debt facility.  Notably, Davis testified that he understood that before the money could be released, the process flow would have to be followed and completed.  Dkt. No. 84-3 at 105:7–15, 167:7–169:22.

After the Term Sheet was signed, Frio Energy and FTL used a chart referred to as the "Gantt Chart Timeline" to track the funding timeline.  Dkt. No. 84-9 at 55:15–56:24; Dkt. No. 84-8.  Although the Gantt Chart Timeline is undated, the chart begins the week of August 9, 2021—the week after the Term Sheet was signed—and projects the full timeline of a transaction.  The Gantt Chart Timeline anticipated that FTL would "[d]etermine required / desired partners" in August or September of 2021, FTL would "[d]iscuss with partners" in October, FTL and Frio Energy would "[a]dapt to partner requirements" in October and November, and that that FTL would "[f]inalize partners" in December.  Dkt. No. 84-8.  The structuring and underwriting phase of the timeline was projected to end in late December.  *Id.*  Ultimately, the legal documents would be drafted and executed and funds would be transferred in late January 2022.  *Id.*  In other words, the Gantt Chart Timeline is consistent with the process diagram and reflects that Plaintiff would have been aware of the significant work that remained before FTL could have raised $150 million in debt.

Testimony by both of Plaintiff's principals reveals that Plaintiff contemporaneously understood that more work remained to be done. Ditto admitted at his deposition the understanding that FTL had not received commitments for a fund giving Frio Energy and FTL the discretion to make investments as the Term Sheet contemplated. Dkt. No 84-9 at 42:5–18. He testified that because no investor had made an unconditional commitment, that is why Plaintiff worked with Defendant to create "very strict deal parameters." *Id.* According to Ditto, "those parameters were what was being ironed out and worked through between mid-August and the end of the year." Dkt. No 84-9 at 42:5–18. Ditto testified that he understood that "[w]e would be able to start acquiring and closing on those properties in January of 2022." *Id.* at 42:25–43:10.

Plaintiff's response is not sufficient to create a genuine dispute of material fact as to whether it reasonably believed Defendant had successfully raised $150 million by October 2021. Plaintiff points to deposition testimony from both Davis and Ditto that they believed that FTL had $150 million in capital committed by the time the Term Sheet was signed. Davis testified as to his understanding that even before Frio Energy had been created, a fund was already established and funded, and that the investments were committed. Dkt. No. 93-1 at 97:25–98:14, 100:9–18, 136:22–138:10. Ditto similarly testified that capital may be committed well before it is called or deployed for a particular transaction, and thus that he understood that in July of 2021, FTL had an absolute right to the $150 million even if the money was not yet in FTL's possession. Dkt. No. 93-5 at 15:9–16:2, 18:9–21, 42:19–44:13. But neither identified a particular communication after the Term Sheet was signed that would have been the basis for such understanding and neither testified that they had such an understanding based on the October 2021 Letters of Intent.

Plaintiff also argues that although Davis testified that the process diagram would have to be followed and completed, he believed that FTL had already obtained the necessary commitments

prior to the Term Sheet and that the parties had to follow the Gantt Chart Timeline not to raise the debt but merely to "release the debt."  Dkt. No. 93-1 at 96:8–13, 97:25–98:14.  But that understanding is plainly contradicted by the terms of those documents.  In light of the parties' negotiations, no jury could believe that Plaintiff understood the $150 million Investment Fund to have preexisted the Term Sheet.  And neither offers any basis upon which they could have believed that FTL would have raised a $150 million debt facility in October 2021 when the timelines to which they agreed no earlier than August 2021 did not provide that such funds would be committed until months after October 2021.

### B.    Capital to Close the Max Permian Transaction

Defendant argues that summary judgment should also be granted on Plaintiff's negligent misrepresentation claim arising out of Defendant's May 24, 2022, assurance that it had raised the necessary funds before authorizing Plaintiff to place a $10.5 million bid on the Max Permian Transaction.  Dkt. No. 83 at 22–24.  Defendant argues that Plaintiff could not have reasonably relied on its reassurances because Plaintiff knew by Spring 2022 that FTL did not yet have the funds or else because Plaintiff failed to discharge its duty to investigate.  Dkt. No. 83 at 23–24.  Neither of Defendant's arguments succeeds.

The undisputed evidence reflects that by April 13, 2022, at the latest, Plaintiff knew from Defendant that FTL would not be able to raise a $150 million debt facility but would have to take investments in the form of equity.  Dkt. No. 93 at 214:24–215:20.  Plaintiff's knowledge in Summer 2021 (or even in October 2021) that Defendant had not yet raised a $150 million debt facility thus does not defeat Plaintiff's claim that in late May of 2022 it reasonably relied on Defendant's representation that it would have the funds for the Max Permian Transaction.  Indeed, Plaintiff's principals testified that when Defendant informed Plaintiff of the switch to a partial equity fund, Defendant informed them that FTL had already raised significant equity.  Davis

testified that in April 2022, Giarrusso told him that FTL had raised $40 million equity portion and would be closing half in May and other half in mid-June. Dkt. No. 93-1 at 214:24–215:20, 234:24–235:12, 302:11–303:8. Ditto testified similarly that it was conveyed to him when the switch was made that FTL has already talked to the capital partners and that FTL had commitments for the $40 million. Dkt. No. 93-5 at 134:10–136:24.

Defendant notes several points prior to May 2022 at which it contends Plaintiff must have realized that Defendant did not have the necessary funds, thus making Plaintiff's reliance unreasonable. Defendant's evidence is insufficient to entitle it to summary judgment.

Defendant claims that "[b]y February 7, 2022, Frio [Energy] knew that FTL had not secured a debt facility and was working on raising an equity fund." Dkt. No. 83 at 10. But, while Defendant's cited email supports the inference that Frio Energy knew or should have known that $150 million in debt had not been raised by FTL, it does not support the claim that Frio Energy would have known that FTL had insufficient funds for the Max Permian Transaction. Dkt. No. 84-14.

Defendant argues that Plaintiff knew in April 2022—when the capital structure switched from debt alone to include equity—that no equity fund had then been raised and that "Defendant was just planning to do so at that point." Dkt. No. 83 at 10. However, Davis and Ditto testified that Giarrusso told Davis "[i]n the April 22, 2022 Zoom meeting . . . that he had already raised the equity fund and that it was fully committed." Dkt. No. 90 ¶ 46; *see* Dkt. No. 93-1 at 214:24–215:20, 234:24–235:12, 302:11–303:8; Dkt. No. 93-5 at 134:10–136:13.

Defendant next cites Davis' testimony that he understood prior to May 2022 that there was no equity investment closed. Dkt. No. 84-3 at 235:8–14. But Davis' testimony is ambiguous as to whether what he learned was that the investment was not closed or that it was not funded. Dkt.

No. 93-1 at 214:24–215:20, 234:24–235:12, 302:11–303:8.  Ditto testified to his understanding that the funds were committed but simply had not yet been successfully called.  Dkt. No. 93-5 at 134:10–136:13.

In light of Plaintiff's evidence concerning Defendant's representations and this contested timeline, Defendant has not established that no reasonable jury could find that Plaintiff was aware in May 2022 that Defendant had not obtained the necessary commitments to fund the Max Permian Transaction.

Defendant argues in the alternative that even if Plaintiff was not aware that Defendant had not raised the funds, Plaintiff's reliance could not have been justified because Plaintiff had a duty to investigate.  Dkt. No. 83 at 21.  The Second Circuit has held that "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts."  *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (citation omitted).  "Only when matters are held to be peculiarly within defendant's knowledge is it said that plaintiff may rely without prosecuting an investigation, as he had no independent means of ascertaining the truth."  *Id.* (citation and punctuation omitted); *accord Ruby Has*, 675 F. Supp. 3d at 431 (same).  "Put another way, if the plaintiff has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."  *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (citation omitted).  "New York cases recognize that the peculiar knowledge exception applies not only where the facts allegedly misrepresented literally were within the exclusive knowledge of the defendant, but also where the truth theoretically might have been discovered, though only with extraordinary effort or great difficulty."  *JP Morgan Chase*

*Bank v. Winnick*, 350 F. Supp. 2d 393, 410 (S.D.N.Y. 2004) (Lynch, J.) (quoting *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999)); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 & n. 9 (2d Cir. 1997) (noting that New York law does not require that the information be "available only to the defendant and absolutely unknowable by the plaintiff before reliance can be deemed justified").[18]

Plaintiff argues that it performed a reasonable investigation under the circumstances. Plaintiff states that it repeatedly requested reassurance from Defendant as to the availability of the funds necessary to close the transaction and that given the structure of the parties' relationship, it cannot be expected to have done more. Dkt. No. 88 at 25; Dkt. No. 93-4 ¶ 29. Davis' affidavit stated that "Frio Energy did not have access to Investment Fund [*sic*] . . . and had no visibility on what was or was not in its accounts." Dkt. No. 93-4 ¶ 31. That evidence is sufficient to create a genuine issue of fact.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendant's motion for summary judgment is granted with respect to (1) Plaintiff's quasi-contract claims for refund of the Structuring Deposition and for compensation for Plaintiff's labor and expenses incurred prior to April 13, 2022; (2) Plaintiff's promissory estoppel claim for compensation for Plaintiff's labor and expenses incurred prior to April 13, 2022; and (3) Plaintiff's negligent misrepresentation claim based upon the Letters of Intention. Defendant's motion for summary judgment is denied with respect to (1) Plaintiff's quasi-contract claim for compensation for Plaintiff's labor and expenses incurred after April 13, 2022; (2) Plaintiff's promissory estoppel

---

[18] New York courts are "indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required." *Crigger*, 443 F.3d at 235. Here, it is undisputed that Davis and Ditto are "sophisticated businessmen with experience related to the purchase, sale of and investment in oil and gas non-operational properties." Dkt. No. 90 ¶ 2.

claim for compensation for Plaintiff's labor and expenses incurred after April 13, 2022; and (3) Plaintiff's negligent misrepresentation claim based upon Defendant's representation that it had sufficient capital to close the Max Permian Transaction.

The Clerk of Court is respectfully directed to close Dkt. No. 82.

SO ORDERED.

Dated: October 15, 2024
　　　　New York, New York

_____
LEWIS J. LIMAN
United States District Judge